MARTHA VAN DYKE v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

In Banc, July 20, 1910.

1. **NEGLIGENCE: Walking on Track: Demurrer.** Deceased was an experienced switchman, and had for five months been working in the railroad yards, and knew that many passenger trains passed, and knew their schedules. He went to a hand car, got a crowbar, and started back towards a car on another switch track on the opposite side of the main tracks, at which he had been working. He stepped upon the main track and turned down it, and, in the most favorable light in which the testimony can be considered, had gone only about twenty-one feet, when a train, running on schedule time, but in excess of the ordinance rate, struck him and killed him. He neither looked nor listened, though the train could have been seen for one thousand feet. The whistle sounded three short toots. *Held*, that a demurrer to plaintiff's case should have been sustained.

2. ————: **Humanitarian Rule.** The humanitarian rule cannot be applied in all its strictness to section men whose business it is to work upon cars in railroad yards, for they are supposed to look out for their own safety, and know, or must be presumed to know, when trains running on schedule time pass. And if, being in a place of safety, they suddenly step upon the track in front of an oncoming train running on schedule time, and only a few feet away, without looking for it or listening, and walk in front of it, and are struck, when those in charge of the train, by a reasonable use of the appliances at hand, could not avoid striking them, there can be no recovery, even though the train was running at an illegal rate.

3. ————: **Evidence: Opinion.** Testimony of a witness that it was his "opinion" that deceased walked "about two or three rails" on the track after he stepped upon it before he was struck by the train, is a mere careless and thoughtless expression of an opinion, and ought not to be considered as evidence at all.

Appeal from Buchanan Circuit Court.—*Hon. C. A. Mosman,* Judge.

REVERSED.

*R. T. Railey, Martin L. Clardy, Woodson & Woodson* and *Henry G. Herbel* for appellant.

(1) Defendant's demurrer to the evidence should have been sustained, and the court erred in refusing same: First, because there was no evidence tending to show defendant was guilty of negligence which caused Van Dyke's death; second, because all the evidence shows deceased was guilty of negligence which caused his death. Tanner v. Railroad, 161 Mo. 510; Reno v. Railroad, 180 Mo. 469. (2) If deceased got upon and walked down the track under the conditions stated, he was guilty of negligence which caused his death and would have prevented a recovery by plaintiff. Evans v. Railroad, 178 Mo. 508. Under such conditions it was not the duty of the engineer to be on the lookout for the safety of the section hands; all the law requires of the engineer is that he must not knowingly

injure the trackmen. Evans v. Railroad, 178 Mo. 517; Moore v. Railroad, 176 Mo. 544; Vogg v. Railroad, 138 Mo. 172. Such employees must look after their own safety. Evans v. Railroad, 178 Mo. 517; Holwerson v. Railroad, 157 Mo. 233. The engineer had the right to presume the deceased would keep out of danger. Evans v. Railroad, 178 Mo. 517; Boyd v. Railroad, 105 Mo. 381; Sweeny v. Railroad, 150 Mo. 396; Moore v. Railroad, 176 Mo. 546; Ries v. Railroad, 179 Mo. 1. It is not even the duty of the section foreman or any one else to look after the safety of the section men; they must be on the alert and keep out of the way of the trains. Evans v. Railroad, 178 Mo. 514; Holwerson v. Railroad, 157 Mo. 240.

*W. K. Amick* for respondent.

The demurrer was properly overruled. There was ample evidence to go to the jury on the theory that defendant's servants saw, or ought to have seen, the deceased on the track and in danger, and thereafter failed to give him warning of the train's approach in time to get off the track, and failed to promptly make reasonable efforts to stop the train and prevent injury. This is the humanitarian doctrine and is well established. Moore v. Railroad, 194 Mo. 12; Rapp v. Railroad, 190 Mo. 161. There was no proof that deceased was negligent in going upon the tracks. The presumption is that he did look for the approaching train and exercised due care for his own safety. Eckhard v. Railroad, 190 Mo. 613; Riska v. Railroad, 180 Mo. 168. The deceased also had the right to presume that defendant's train would not be run at a greater speed than that allowed by ordinance. He also had the right to presume that the bell would be rung as required by ordinance. Riska v. Railroad, 180 Mo. 168; Weller v. Railroad, 164 Mo. 199. The presumption is that the deceased did look for the approaching train before going upon the track. And the fair and reasonable inference

under the evidence is that the train was not yet in sight when he went upon the track. In fact this may be presumed, for it is presumed that he exercised due care.

FOX, C. J.—This is an action by plaintiff under section 2864, Revised Statutes 1899, to recover the penalty in said section prescribed for the alleged negligent killing of her husband by one of defendant's trains.

Plaintiff had a verdict and judgment below for five thousand dollars, and defendant appealed to this court. Defendant urges that the facts disclosed failed to show plaintiff's right to recover under the law, and that its demurrer to the evidence should have been sustained. This contention requires a close and detailed statement of the facts.

Defendant ran its trains in and out of St. Joseph, Missouri, on the tracks of the C. B. & Q., or Burlington Railway Company. The place of the accident is in South St. Joseph, in the railroad yards, at a point twelve to thirteen hundred feet south and west of Illinois avenue in said city. Near the intersection of Illinois avenue (which street runs east and west) and the railroad tracks was a depot, and some of the distances named are calculated from the southern end of this depot. South of Illinois avenue are the railroad yards, a strip three hundred feet in width, fenced upon each side with wire fence, and it was within this enclosure that the deceased met his death. Upon this property appear to have been signs indicating that it was private property and forbidding trespassing. It does appear from the evidence that at one point the wires had been cut and that there was a path across these yards. To the east of the yards were a number of houses, evidently owned by laborers in the employ of the packing houses, which were to the west of the switchyards. The evidence discloses the use of these yards by such

employees in going to and from their work, which use seems to have been at the morning, noon and evening hours.

The Burlington Railway Company had two main line tracks in this enclosure. Upon one of these tracks all south-bound trains were run, and upon the other all north-bound trains were run. Van Dyke, the deceased, was in the employ of the Burlington Company, as section man, and for some months had been at work in these yards. Besides the tracks of the Burlington there were two other railroad companies which had main line tracks within this fenced enclosure. All Burlington and Missouri Pacific trains used the Burlington tracks. All told a great many trains passed this point in the course of a day.

Going now to the details of this accident and its surroundings, we note that deceased was killed by a south-bound Missouri Pacific passenger train which left Union Station at 10:25 a. m. on July 7, 1904. The train was on the west main line Burlington track and was running on schedule time that day. It was due at the point of accident at about 10:35, if on time, and it was shown to have been on time. The schedule rate of speed at the point of accident was twenty-one miles per hour. Plaintiff's evidence tended to show a speed that morning of thirty-five to forty miles per hour, while defendant's evidence showed a rate of twenty-five miles per hour.

The depot referred to above is south of Illinois avenue, and the south end of the depot is about one hundred and fifty feet south of the south line of Illinois avenue. From the evidence it appears that a train did not become visible to persons in the neighborhood where deceased was at work until it reached the south end of the depot. At a point between eleven hundred and twelve hundred feet south of Illinois avenue there began a cut-off track which connected the two main line tracks of the Burlington. The path spoken of

above crossed near this point. To the west of the west
main line track was what was called the "team track,"
which connected with the west main line track about
nine hundred and fifty feet south of Illinois avenue.
Upon this track cars were continuously standing. To
the west of this track and over near the west wire fence
was a switch track, which came to an abrupt ending
at a point something over thirteen hundred feet south
of Illinois avenue. On the day in question a car had
been partially derailed at the end of this track. In
other words, the south end of the car and the trucks
thereunder had been pushed beyond the end of the rails
of this "stub" track. Deceased and others were en-
gaged in getting this car back upon the track. Shortly
before the accident deceased went north to the cut-over
track above mentioned, to get a crowbar from a hand-
car which was standing on this cut-over track. In re-
turning with the crowbar deceased walked for a space
upon the west main line track with his back to the com-
ing train and was struck and killed. The principal
point of dispute is the distance which deceased walked
upon this track before being struck. Plaintiff urges
that deceased was walking on this track for a space
of ninety feet; defendant claims that he was on the
track but for a short space.

Before going into the testimony of witnesses in
detail other further general facts should be noted. The
car upon which deceased and others were working was
thirty-four or thirty-six feet long, and the south four-
wheel trucks were off the tracks and on the ground.
The railroad rails were shown to be thirty-three feet in
length. It also appears that after the accident and be-
fore the trial this "stub" track was extended about
two-thirds of a rail-length, or twenty-two feet, and thus
there is occasioned some of the discrepancies between
the testimony of the two sides. Plaintiff's measure-
ments of distances were made a few days before trial
and after the extension of this track for the distance

aforesaid. In making their measurements the witness
for the plaintiff, on the Monday before the trial, began
at a point where the west rail of the cut-off track was
six feet from the east rail of the main line track, and
measured to a point seven feet beyond the rails of the
"stub" track, and found the distance to be one hun-
dred and ten feet. These are the figures given by wit-
ness Patton for the plaintiff and is her only measure-
ment. Another witness says that an extension of two-
thirds of a rail's length, or about twenty-two feet, had
been added to the track after the accident and before
the measurements. The measurements made by de-
fendant's witness were made from a point where the
west rail of the cut-off track was nine feet from the
east rail of the main line, which would make their start-
ing point somewhat south of the starting point taken.
by plaintiff's witness Patton. There had been marks
placed upon the rails indicating the position of the
handcar, the point where deceased was struck and the
point where he was picked up, with some other marked
points. From the testimony it would appear that de-
fendant's starting point was correct. Plaintiff's wit-
ness Mount practically so says, although he disputes
another marked point, and Moore, another witness,
says the mark as to where the handcar was located
was properly placed.

At this point it would be well to state that but three
eyewitnesses to the accident testified—Moore and
Mount for the plaintiff, and the engineer for the de-
fendant. In this connection we will give the measure-
ments made by the defendant. As above stated, a civil
engineer made measurements for defendant, beginning
at a point where the west rail of the cut-off track was
nine feet from the east rail of the main track. At this
point there was a red mark on the rail, which Moore
says correctly located the handcar, and which Mount
says was practically correct. Eleven feet south of this
mark was another, which defendant claims is the point

where the deceased was struck. The witness Mount says this mark does not correctly locate the place, and that he so stated when it was put there. He says that the place where deceased was struck was ten or more feet south of this mark. But getting back to defendant's measurement—it was eleven feet from the first mark (place of handcar) to the second mark (alleged place of accident). This witness measured the distance from the handcar to the south end of where he was told the boxcar stood and that was sixty feet, and deducting the eleven feet would leave forty-nine feet from the second mark to the south end of the boxcar, under which the men were working.

The testimony further of these witnesses bearing upon the crucial points we will next outline. The first witness, Ed. Moore, is very unsatisfactory. He says that he was cutting weeds along the track to the north of this boxcar; that he and another man were cutting the weeds at the end of the ties about a rod or a rod and a half north of this car; that Van Dyke left the south end of of the car and went to the handcar, took a drink of water, and then picked up this iron bar and started back; that he got in the main line track and started south; that in his opinion he walked two or three rails; that he passed witness. This witness being further pressed by counsel for plaintiff as to the point where deceased was when struck, said: "A. I could not tell you just exactly. There were weeds up quite high and I could not say exactly." He says further on that the weeds were waist high in places; that the body was thrown up cab high, and that he believed it was south of where the men were working when it struck the ground. At another place the witness says that he went over the ground after the accident with two other men, and that deceased had walked "just about three rails as near as I could make it;" that he timed the other men and it took them thirty-five seconds to walk the distance,

and they were walking about as Van Dyke walked; that the train was running thirty-five to forty miles per hour at the time of accident. Witness also said that the iron bar which plaintiff was carrying on his shoulder was thrown six rail-lengths, struck and made a dent in a tie and then went three rail-lengths further; that he heard no bell. He first said he heard this train whistle for the men and then said he did not know whether it was this train or not. No other train was shown to be around there at this time. On cross-examination this witness said Van Dyke had been working in these yards from March 9th to July 7th, the day of accident; that the handcar was twenty-five feet north of the derailed car; that it was eight to ten feet from where the handcar was standing to the main line track; later he says he had no idea as to this distance. It appears that during the cross-examination of this witness Moore, the court adjourned over the night, and the witness went down and took another view of the situation. The next morning, being pressed again about the place where the engine overtook and struck deceased, and as to whether the deceased had walked ninety feet, the witness said:

"Q. You must answer this question: I am asking you what caused him to go sixty-five feet below that car, if they were only twenty-five feet apart— these two cars. You said he walked ninety feet? A. He went down the line a little west, just ready to make a step out and this train come on by and hit him.

"Q. Stepped out where? A. After he went down the line a little west.

"Mr. Amick: He didn't say 'step out.'

"(Next to last answer read).

"Judge Woodson: Q. Where did he step out? Stepped out where?

"Mr. Amick: I appeal to Your Honor.

"The Court: That is right. He didn't say that— Just about ready to step out.

"Judge Woodson: Q. How do you know he was ready to make a step out? A. Well, as he was stepping, he looked and got a glimpse of the train and it whirled him right around.

"Q. Where was he? When did he kind of whirl around? Where was he with reference to this car that he was going to? A. The handcar?

"Q. Where was he with reference to the freight car? A. He was just in the main line track—just going—

"Q. How far was he east of it—was he directly east or was he south or was he north of it? A. He was going south.

"Q. I didn't ask you which way he was going. I asked you where he was. A. He was in the main line track.

"Q. How far south or north was he of this car that was derailed? A. *I couldn't tell you the distance, because I don't know.*

"Q. How far south or north was he of this car that was derailed? A. I couldn't tell you the distance, because I don't know.

"Q. *Was he north or was he south of it?* A. *Where that car was derailed?*

"Q. *Yes, sir.* A. *Well, he was north of it.*

"Q. How far north of it was he? A. *Of course, I don't know; but it might be about fifty feet; I would not say; of course, I don't know.*

"Q. *He was fifty feet north of the car when he was struck when he started to turn around?* A. *Then, of course, he was struck there.*"

The first question above quoted is explained by the fact that at one time the witness said that the handcar was only twenty-five feet north of the south end of the derailed car, and that deceased walked about three rail-lengths before being struck, which (counting thirty feet to the rail) would make ninety feet, or sixty-five

feet south of the place where the men were engaged at work. Further on this same witness says:

"Q. Don't you know as a matter of fact that this derailed car at the end of this switch was about sixty feet north—about sixty feet south of the handcar? Now, I don't want what you testified to before, but from your examination this morning, isn't it your judgment that the distance from this handcar where Mr. Van Dyke got the bar south to this car that you all worked at—wasn't it about sixty feet of that north? A. It may be about—about somewhere along there; I could not say.

"Q. That is your best judgment. Now then if that is true that it is about sixty feet, then he was ten feet south of the handcar was he—you take fifty feet from sixty feet, and it leaves ten feet—it must have been ten feet from the handcar where he was struck? Isn't that true? A. *I believe it is.*

"Q. Now, I ask you this question: Have you ever seen any red marks right on the west side of the west rail of this cut-off where this handcar set, made there by a red pencil, at any time? A. I saw them after they was put there.

"Q. That red mark was where that handcar stood wasn't it? A. Yes, it is about in line of that mark

. . . .

"Q. Did you see on the west rail of the west track any red mark made in pencil, the same as the one you have described? Did you see any on the west rail of the west track or the main line on which this train was running, a red mark at any time? A. I didn't see it this morning; I have seen one there.

"Q. Now then, how far was that red mark south of the handcar? A. From the second mark you mean?

"Q. Yes, sir. How far was it right down the track—about how many feet? A. It was where Mr. Van Dyke would have to take that bar?

"Q. Yes, sir. Down to that red mark? A. I could not say exactly. It was from ten to twelve feet, I should think.

"Q. How far was this mark on a straight line up and down—not diagonal across—but up and down the track? A. It would be somewheres about twelve or thirteen feet.

"Q. Now then, when did you first see these marks? A. I believe it was the next day afterwards they was put there.

"Q. Who put those marks there? A. I could not say, because I never saw the person put them there.

"Q. You went there, did you not, with Mr. Woodson here and these marks were pointed out as the place where the handcar was setting when he got the bar, and where he was when he was struck; and when he pointed this place out, you were there at the time and talked it over? A. Yes, sir.

"Q. Did you ever intimate to any one that they were not the places where he got on the track and where he was struck? A. I didn't make any remarks to anybody.

"Q. But they were there looking at these places —these marks, as the places where he got on the track and where he was struck and you never denied it? A. I didn't take any notice of the marks.

"Q. Now, I will ask you as a matter of fact, if these marks do not correctly show the place where he got on that track and the place where he was struck? A. Of course, he had—

"Q. I say do they not show correctly where he got on the track and where he got struck?

"The Court: Answer the question.

"A. I could not say, he had to walk down—

"Judge Woodson: Q. I asked you if these marks don't designate correctly the place where he got on that

main track and where he was struck on that track?  A.,
Of course, the distance that I stood—

"The Court:  Never mind; you have got to an-
swer the question.  Answer the question.

"A.  *Just about.*"

These are the marks testified to by the civil engi-
neer, witness for defendant, as being eleven feet apart
by actual measurement.  Witness Moore further says
that he did not see Van Dyke look or listen for the train
before going upon the track.

The next eyewitness for plaintiff, although he did
not exactly see the actual striking, but did see the
situation a moment prior, was Frank Mount.  This
witness said:

"Q.  Where was you?  A.  Underneath the car.

"Q.  What part of the car?  A.  About the mid-
dle west.

"Q.  What kind of a car?  A.  A cattle car that
was jacked up.

"Q.  Freight car?  A.  Yes, sir.

"Q.  What attracted your attention?  A.  Whistled
—whistled for him to get off the track.

"Q.  How soon after you saw him?  A.  I looked
up as soon as I heard the whistle; I was pretty well
on the outside of the car underneath.

"Q.  On which side?  A.  On the east side and I
was pretty well over that side; I was underneath the
car.

"Q.  What did you see?  A.  I seen Van Dyke.

"Q.  How soon after the whistle was it that you
saw him?  How soon did you look around after you
heard the whistle?  A.  Just as soon as I heard it.
They had whistled before I did look; as soon as they
did—two or three —

"Q.  Was the whistling all continuous?  A.  Yes,
sir.

"Q.  As soon as it whistled you looked?  A.  Yes,
sir.

"Q. What did you see? A. I seen Van Dyke; he was about to get struck; it seemed that something brought my head to the ground to keep from seeing him.

"Q. Where was he from you at that time? A. He was very near straight across from me.

"Q. Right opposite of you? A. He wasn't plum opposite, but he was somewhere in the neighborhood of that."

On cross-examination this witness said:

"Q. Now then I will get you to state what was the first thing you saw or heard that attracted your attention. A. I heard the whistle.

"Q. How many times did it whistle? A. I will tell you; I don't mean that train was running wild and whistled close—I mean that it whistled as it does for danger.

"Q. It went toot—toot—toot? A. Yes, sir.

"Q. How far—what direction was that from you when you heard it? A. It looked like it was straight across from me—to me.

"Q. When it whistled it was straight across? A. Yes, sir.

"Q. Where was the man standing when he was struck at that time? I mean Van Dyke? A. He was walking down the track.

"Q. In what direction from you? A. He was— looked like he was straight across from me—right across from me. *He might have been a little above; I guess he was a little above me.*

"Q. *How much above you was Mr. Van Dyke?* A. *I think that the man was a rail and a half north of me.*"

The remaining eyewitness testifying in the cause was Mr. Hall, the engineer. His testimony was that when he first saw Van Dyke he was about one hundred feet ahead of the engine stepping up to the end of the tie on the left of the track; that he stepped into the

track and took two or three steps and was struck; that
when he first saw deceased he shut off the steam, ap-
plied the air and began to whistle; that the engine was
within twenty or thirty feet of deceased when he began
to whistle, owing to the fact that it took some little
time to get hold of the appliances; that had deceased
gone across the track instead of turning down it, he
would have been saved; that his train could have been
stopped in from 275 to 300 feet.

By the conductor and express messenger it was
shown that danger signals by the whistle were given.

The testimony shows that laborers at the packing-
houses cross over the tracks morning, noon and night,
and that members of their families crossed there about
noon taking over lunch, and that the engineers knew
these facts. This is the character of user shown.

There was a city ordinance which limited the speed
of trains to five miles an hour, and this train was near
the corporation line, but within the city limits. By
rule of the company in evidence, section men were re-
quired to look out for trains and keep out of their
way.

Under the evidence a train could have been seen
when it reached the south end of the depot, and the
south end of the depot, as stated above, was 150 feet
south of Illinois avenue. The engineer could have seen
a man on the track for about the same distance.

This substantially indicates the controlling facts
as disclosed by the record upon which this case was
submitted to the jury.

At the close of the evidence the cause was sub-
mitted to the jury and they returned a verdict for the
penalty provided by the statute—the sum of five thou-
sand dollars. Timely motions for new trial and in
arrest of judgment were filed and by the court over-
ruled. From the judgment rendered in accordance with
the verdict returned the defendant in due time and

230 Sup—18

proper form prosecutes its appeal to this court, and the record is now before us for consideration.

## OPINION.

Upon the disclosures of the record before us it is apparent that the main question with which we are confronted is the propriety of the action of the trial court in declining to give, at the request of the appellant, at the close of all the evidence, an instruction in the nature of a demurrer to the evidence. The correct solution of this proposition must be sought by a careful analysis of the controlling facts developed upon the trial. We have indicated in the statement of this cause substantially the nature and character of the testimony developed upon the trial, and after carefully considering in detail all of the testimony introduced at the trial we see no escape from the conclusion that the plaintiff in this case was not entitled to recover. When all of the testimony introduced in this cause is fully considered, viewing it from the most favorable light for the plaintiff, it fails to make out a case which authorized the submission of the cause to the jury.

Mr. Van Dyke, plaintiff's husband, was, at the time of the accident, a trackman in the employ of the Burlington Railroad Company; he was about thirty-one years old; his daily work was in these railroad yards. So far as the record discloses his eyesight was good as well as his hearing. He was familiar with the trains and the usual course of the trains, as well as the time of the passage of trains, at the point where the accident occurred. He had been working in these yards about five months. On the morning of the accident Mr. Van Dyke was helping other trackmen replace a freight car on the west side track from which it had become derailed. In doing this work he went from the derailed car to a handcar that was on the east side track to get a crowbar to be used in the work of replacing the derailed car. This handcar was east and north of

the derailed car. As to the exact distance north there is some conflict in the evidence. Plaintiff's husband got the crowbar and started back with it on his shoulder. He stepped on the main track, upon which defendant was operating its cars, turned south and walked in the direction of the derailed car, and while so walking an engine drawing a passenger train of the defendant coming down the main track struck him and killed him.

The controlling question in dispute is the distance which the deceased walked upon this track before being struck by the engine of the defendant. Learned counsel for respondent insists that the testimony as introduced by the plaintiff would fully warrant the conclusion that the deceased, after he stepped upon the track, walked eighty or ninety feet south before he was struck. Manifestly when the testimony introduced by the plaintiff is fully considered and viewing it in the most favorable light in her behalf, counsel for respondent is in error in this insistence. The measurement of the distance between the location of the handcar and the derailed freight car was made by Mr. Patton, in company with the learned counsel representing the plaintiff in this cause. This measurement was made on Monday before the trial, January 13, 1905. The measurement as made by Mr. Patton began at a point on the Burlington track where the east rail was six feet west of the west rail of the cut-off track where the handcar stood and ran to a point opposite and east of a point seven feet south of the south end of the switch or tail track where they supposed the freight car was off. That distance was found to be 110 feet and no more. Mr. Mount, a witness introduced by plaintiff, testified that since the accident the switch or tail track had been extended about two-thirds of a rail, which would be about twenty-two feet. The testimony upon this point is uncontradicted that after the accident and before the measurement as taken by Mr. Patton twenty-

two feet had been added to the switch or tail track, and
that such twenty-two feet were embraced in the meas-
urement as made by Mr. Patton. The testimony shows
that the derailed freight car was thirty-four or thirty-
six feet long. Now if you will deduct two-thirds of a
rail or twenty-two feet added to the switch or tail track,
and also deduct thirty-five feet as the length of the
derailed freight car, both of which were embraced in
the measurement as made by Mr. Patton, from the 110
feet, according to his measurement, you would have
left fifty-three feet as being the distance from the north
end of the derailed freight car to where the handcar
stood at the time of the injury, and the testimony is
undisputed that the deceased, Mr. Van Dyke, was
struck on the main line of the Burlington railroad at
some point within the distance between the south end
of the handcar and the north end of the derailed freight
car. In addition to this Mr. Mount, witness for the
plaintiff, testified that at the time of this accident he
was under the derailed freight car, near the west side,
about the middle; that the train whistled two or three
times, the witness thus expressing it, "it went toot—
toot—toot." While this witness, Mr. Mount, testified
that it seemed to him when he looked up after hear-
ing the whistle that it was right opposite where he was,
he then explains and says, "not plum opposite, but in
that neighborhood." Afterwards in giving details he
says that Van Dyke when the train whistled was about
a rail and a half north of him. This witness was under
the derailed freight car, about the middle; it was about
seventeen and a half feet from where Mr. Mount was
under the car to the north end of the car, the full
length of the car being thirty-five feet. If you will
deduct this seventeen and a half feet from the forty-
nine and a half feet, the distance embraced within a
rail and half which the witness says Mr. Van Dyke
was north of him, you would then have Mr. Van Dyke
about thirty-two feet north of the north end of the

derailed freight car. The distance between the south
end of the handcar and the north end of the derailed
freight car being fifty-three feet, this would result in
the conclusion that Mr. Van Dyke after stepping upon
the main line of the Burlington track only walked about
twenty-one feet, which would be about seven steps.
This simply verifies other statements made by witness
Mount when he was going over the Burlington tracks
and certain marks were pointed out to him as being
the point where Mr. Van Dyke was struck by the train.
These marks were placed there in the measurement
made by Mr. Irwin, who was a deputy county surveyor
of Buchanan county. The mark as pointed out to the
witness Mr. Mount, was about eleven feet from the
south end of the handcar, and witness Mount testified
substantially that while in his opinion the mark rep-
resenting where the handcar stood was correct that he
could not say for sure, but he thought the mark rep-
resenting the point where Mr. Van Dyke, the deceased,
was struck by the engine, was not correct. In his opin-
ion the mark should have been made ten feet further
south. This would place Mr. Van Dyke at the time he
was struck, twenty-one feet south of the south end
of the handcar. This statement is strictly in accord
with the result reached from his other statement that
Mr. Van Dyke was a rail and a half north of him when
he (Mount) was working under about midway of the
derailed car. The correctness of the conclusion de-
duced from the statement of witness Mount that
Mr. Van Dyke at the time he was struck was a num-
ber of feet north of the north end of the derailed car,
is further emphasized when we take into consideration
that this witness says that the train whistled three
times and the whistling was continuous, and that the
witness looked up and discovered that Mr. Van Dyke
was about to get struck. He says at this point that it
seemed that something brought his head to the ground
to keep him from seeing him struck. This tends

strongly to show that the whistling and the striking
of the deceased, Mr. Van Dyke, was as the witness
states, a number of feet north of the north end of the
derailed car. While it may be that the occurrences
about which the witness testifies about the time of the
striking of Mr. Van Dyke, may have taken a very
short time, yet manifestly the whistling three times,
which attracted the attention of the witness, Mr. Mount,
and the realization by him that Mr. Van Dyke was
about to be struck, then something occurring that
brought his head to the ground so that he did not see
the striking of Mr. Van Dyke by the engine, must have
consumed at least some length of time, and clearly a
sufficient length of time, if the whistling was directly
opposite the derailed car, that the striking of the de-
ceased Van Dyke would have occurred south of the
derailed car, which all of the testimony in this cause
shows was not the case.

Manifestly the insistence of counsel for the re-
spondent that Mr. Van Dyke had walked eighty or
ninety feet after stepping on the main track of the
Burlington railroad before he was struck is based upon
the expression of opinion by witness Ed Moore. This
witness in answer to a question propounded to him as
to how far the deceased walked on the track, answered,
"Well, my opinion—it was in my opinion about two
or three rails." When the whole of this witness's
testimony is considered it is made apparent that that
answer was a mere careless and thoughtless expres-
sion of an opinion of a fact which in view of his other
statements made in detail concerning the same sub-
ject, could not and ought not to be considered as evi-
dence at all. As was said by this court in Koons v.
Railroad, 178 Mo. 591, "this is not testimony of a fact
which the witness knows, but is simply the opinion or
impression of the witness formed since the accident."
Again it may be said that this did not amount to testi-
mony establishing any fact or tending to do so for the

further reason that it is in contradiction of the physical facts. As heretofore pointed out the distance between the south end of the handcar and the north end of the derailed car was far less than ninety feet. But aside from this the witness himself, subsequent to making the statement about Mr. Van Dyke walking two or three rails, clearly indicates by his detailed statement of the facts that he did not wish to be understood either by the court or jury that he was testifying that the deceased walked either sixty or ninety feet after stepping upon the main line of the Burlington railroad before he was struck.

Witness Moore testified that he heard the whistle blow. He says in answer to a question as to when he heard it blow, that "it whistled quite loud for us upon the track, but I was not paying attention to the whistle." This witness also gave testimony concerning the distance between the handcar and the derailed freight car. His testimony at first upon this particular point was as follows: "Q. How far north of the freight car was the handcar at the time Van Dyke was struck? A. I don't know, exactly, but it was— The Court: Answer as near as you can. A. About twenty-five feet, I should judge. Q. Twenty-five feet from where the handcar sat on the cut-off between the east and west Burlington tracks down to a point clear on as far south as the end of your car—you said twenty-five feet, I believe? A. That is my opinion; yes, sir." This witness further testified that he could not say how many feet it was that Mr. Van Dyke walked after stepping upon the main line of the Burlington track near the handcar; but he does positively say when the question is propounded to him as to whether or not Mr. Van Dyke at the time he was struck by the engine was north or south of the derailed car, that he was north of it. The inquiry was further made as to how far north of this derailed car was Mr. Van Dyke at the time he was struck. This witness answered,

"Of course I do not know, but it might be about fifty feet, I would not say; of course I do not know." This witness further answered the inquiry as to whether as a matter of fact this derailed car at the end of the tail or switch track was not about sixty feet south of the handcar, and he answered, "It may be about—about somewhere along there; I could not say." Following this the inquiry was made of the witness Moore, stating to the witness that it being his best judgment that the derailed car was about sixty feet south of the handcar, and that having formerly expressed the opinion that Mr. Van Dyke might have been about fifty feet north of the derailed car at the time he was struck, under that state of facts, deducting the fifty feet from the sixty feet, would make the point where Mr. Van Dyke, the deceased, was struck, about ten feet from the handcar, and the witness was asked if that was not true, that the point upon the main track where the deceased was struck was about ten feet south of the handcar, and his answer was, "I believe it is."

This testimony fully corroborates the testimony of the engineer wherein he states that when he first saw the deceased he was one hundred feet in front of him at the east end of the ties and stepped two steps beyond the middle of the track and turned south and took not more than three steps and after he discovered him blew the whistle several times for him before he struck him. In the statement of Hall, the engineer, he says that it took him some little time to get to the whistle after he discovered Mr. Van Dyke in a place of danger. According to the testimony of the engineer Mr. Van Dyke was about ten feet south of the handcar when he was struck; this would be about three steps that the engineer says he took, and that conforms to the opinion as expressed by witness Moore, and as to the alarm whistles, the danger signals, the engineer is corroborated by witness Mount, as well as witness Ed Moore.

When you carefully analyze the testimony of witness Moore, in his opinion the point at which the deceased was struck after he turned south upon the main track, was about ten feet south of the handcar. According to the testimony of witness Mount Mr. Van Dyke was ten or eleven feet further south than witness Moore makes it, which would make it twenty-one feet south of the handcar.

There were only three eyewitnesses to the accident which resulted in the death of plaintiff's husband— Frank Mount and Ed Moore, who were introduced by the plaintiff, and the engineer in charge of the engine that struck deceased. After a careful consideration of the testimony of Mount and Moore it is clear that their testimony upon the vital and pivotal point in this controversy does not contradict the testimony of the engineer. The only difference between the testimony of Mount and that of the engineer is that Mount places the point of the striking ten or eleven feet further south than the engineer. Manifestly this does not contradict the engineer's statement that he first saw Mr. Van Dyke about one hundred feet in front of him when he stepped upon the track, and that he used every effort, consistent with the safety of the passengers, to stop the train. Witnesses Mount and Moore, introduced by the plaintiff, not only do not contradict the testimony of the engineer, except in locating the point of the striking of the deceased, which only makes a difference of a few feet, and this does not in any way make a material change in the location of the parties and as to what was done by the engineer after he discovered Mr. Van Dyke upon the track. But on the other hand the testimony of the two eyewitnesses introduced by the plaintiff, when it is fully analyzed in accordance with the measurements made of the distance between the south end of handcar and the north end of the derailed car, substantially corroborates the testimony

of the engineer in charge of the engine at the time of this fatal accident.

Applying the well-settled rules of law upon this proposition to the facts as developed upon the trial, and which have heretofore been substantially indicated, we repeat that plaintiff was not entitled to recover in this action. Plaintiff's husband was an experienced section hand; he was perfectly familiar with the numerous trains that passed the point where this accident occurred, as well as the schedule time at which the trains passed. The testimony discloses that numerous trains, both passenger and freight, passed the point where Mr. Van Dyke was engaged at work, and he was perfectly familiar with the rule that required the section men to keep a lookout for trains; notwithstanding this experience and his knowledge of the passage of trains, as well as the time of their passage, he steps upon the main track of the Burlington Railroad Company, upon which the defendant was operating its train, just about the time defendant's train was due, and, so far as the record discloses, without looking, listening or paying any attention whatever, turned his back in the direction from which defendant's train was approaching, without at any time turning around to look for the approach of such train; he only took a few steps—not exceeding seven, until he was struck. In other words, when the testimony is all considered in this case it in effect shows that Mr. Van Dyke stepped nearly directly in front of an approaching passenger train without paying the least attention to the approach of such train. The testimony discloses that he could have passed over the main track and been perfectly safe; but notwithstanding his full knowledge of the situation he voluntarily assumed the dangerous position upon the main track. This, in our opinion, was such gross negligence that, if the well-considered adjudications upon that subject are to be longer followed, precludes the plaintiff from a recovery in this

cause. The only testimony as to when the deceased was discovered upon the track is that given by the engineer, and the record discloses that after he discovered the deceased upon the track he used every reasonable effort to avoid the accident; gave the alarm signal as promptly as he was able to do under the circumstances.

Respondent insists that the judgment in this cause can and should be maintained upon the humanitarian rule that has frequently been announced by this court. In Evans v. Railroad, 178 Mo. l. c. 517, it was pointed out that "it will not do to apply this rule in all its strictness to section men whose business it is to work upon and keep in repair railroad tracks, for they are supposed to look after their own personal safety, and to know of the time at which trains pass, to look for them and see them, and to move out of the way. It is of common knowledge that these men often voluntarily wait until trains get dangerously close to them, and then step out of danger and let them pass by, and to require trains to stop upon all such occasions, when section men are discovered at work on the track, would not only be imposing upon railroads unjust burdens, but would greatly interfere with traffic and travel. Those in charge of trains have the right to presume in the first place that such persons will keep out of danger, and not until they have good reason to believe they will not do so, and then fail to use all proper means at their command to prevent injuring them, in consequence of which they are injured, or are injured by reason of the willful negligence of those in charge of the train, should the defendant be held liable."

In Davies v. Railroad, 159 Mo. 1, it was expressly ruled that it was gross negligence for persons to assume a place of danger upon railroad tracks and thereby trust that the agents of the railroad company in the course of their employment will be more watchful

of the safety of persons assuming such dangerous positions than themselves.

In Clancy v. Railroad, 192 Mo. 615, the plaintiff sought a recovery against the railroad company for injuries received.  It appears from the disclosures of the record in that case that plaintiff was not an employee of the railroad company, but was working in a trench for a gaslight company in a space between the two railroad tracks; that he had full knowledge that the cars were passing backward and forward upon the tracks by this place where he was at work. Some excuse was offered for his carelessness in not observing the cars in passing, that he was so engrossed in his work that he did not take notice of the approach of the cars.  It was expressly ruled upon that state of the record that "the plaintiff, therefore, had no right to permit his mind to become so engrossed in his work as to become heedless of his danger, and as not to take proper precautions to observe the approach of cars."  That was the rule applied to plaintiff Clancy, who was not an employee of the railroad, but who was at work along the line of railroad for another party.  Obviously the reasons are much stronger why that rule should be applied to the plaintiff's husband in the case at bar, who was a section man and whose duties especially required him to be on the lookout for approaching cars.

In Moore v. Railroad, 176 Mo. 544, the rule of law applicable to persons stepping upon railroad tracks in front of approaching trains was clearly pointed out and the rule as therein announced is clearly applicable to the plaintiff's husband in this case, for he knew, or at least was presumed to know, the time of the arrival of that train, and just about the time the train was due he carelessly and recklessly stepped upon the track and without looking or listening, carelessly and negligently turned his back in the direction from which the train would approach that point.

It was said by this court in the last case cited (Moore v. Railroad), that "it has always been the law in this State that it is such gross negligence as precludes a recovery for a person to step on a railroad track directly in front of an approaching train and so close to it as to render it impossible to stop the train in time to avoid injury ... and this is true even if the train was running at a rate of speed in excess of the maximum rate permitted by law. [Tanner v. Railroad, 161 Mo. 497.] For in such case the negligence of the injured party and not the rate of speed of the train is the proximate cause of the injury."

In McGrath v. St. Louis Transit Co., 197 Mo. 97, decided by Division No. 1 of this court, in which all concurred, the rules of law announced in the cases herein indicated of Evans, Davies and Clancy v. Railroads, were approvingly referred to and the doctrine as announced in those cases was followed and made the basis of the conclusion reached that the judgment in the McGrath case should be reversed.

The comparatively recent case of Degonia v. Railroad, 224 Mo. 564, in our opinion, is decisive of the case at bar. In that case Degonia was, like Van Dyke in the case at bar, employed by the railroad company as a section man. Graves, J., speaking for the Court In Banc, said: "In the case at bar deceased knew that a train was due [so did Mr. Van Dyke in this case know that a train was due]; he knew it was coming from the north [so did Mr. Van Dyke in this case know that the train was coming from the north]; very shortly beforehand he leaves a place of safety and assumes a place of danger, with his back to the north, from whence he knew a train was coming." So in this case, Mr. Van Dyke left a place of safety and assumed a place of danger, with his back to the north from whence he knew a train was coming. Finally the court in that case announced the conclusion in the following

language: "In the case at bar under the plaintiff's proof the court should have declared as a matter of law that the deceased was guilty of contributory negligence. He had worked for a long time in these yards. The train that struck him was a regular train and running on schedule time. He knew the time of the train and the direction from which it was coming or, as an experienced employee, will be presumed to have so known. He was in duty bound not to become so engrossed in his own work as to endanger his own safety. Yet with his back toward an oncoming train, without any precaution whatever, he continues his work. I shall not elaborate upon this, because the evidence is too clear to require elaboration"—citing in support of the conclusion reached the following cases: Davies v. Railroad, 159 Mo. 1; Evans v. Railroad, 178 Mo. 512; Wheat v. St. Louis, 179 Mo. 572; Clancy v. Railroad, 192 Mo. 615; McGrath v. Railroad, 197 Mo. 97; Cahill v. Railroad, 205 Mo. 393; Brockschmidt v. Railroad, 205 Mo. 435; Riccio v. Railroad, 189 Mass. 358. As before stated, this case obviously is decisive of the case at bar. We see no necessity for pursuing this subject further. While this accident, like all others of a similar character, enlists our sympathy and was strikingly unfortunate, yet if we are to longer follow the well-considered adjudications upon this proposition, we repeat, there is no escape from the conclusion that the plaintiff in this cause is not entitled to recover.

Entertaining the views to which we have given expression, it follows that the judgment of the trial court should be reversed, and it is so ordered. *Gantt, Burgess* and *Graves, JJ.*, concur; *Valliant* and *Lamm, JJ.*, dissent. *Woodson, J.*, not sitting.