JOHANNA HITZ, Respondent, v. ST. LOUIS SOUTH-WESTERN RAILWAY COMPANY, Appellant.

Springfield Court of Appeals, January 3, 1911.

1. RAILROADS: Injury to Track Repairer. Plaintiff's husband, a section man, was engaged with others in repairing tracks in the union·station yards of the Terminal Railroad Association at St. Louis, when a train of defendant, leaving the station, struck and killed him. 'The case was tried on the humanitarian doctrine. The evidence is examined and *held* that there could be no recovery on this theory, for the reason that the servants operating defendant's passenger train had a right to expect a clear track at the place where the accident occurred, and were not in duty bound to keep 'a lookout along the track in front of the train.

2. ——: ——: ——. The humanitarian doctrine cannot be applied in its strictness to employees working on the railroad. As to them the rule is different from the rule as to passengers and strangers.

3. NEGLIGENCE: Anticipating Danger. In considering the question of negligence it is a truism that an ordinarily prudent person would not take precautions to guard himself against the danger which he could not reasonably anticipate, and when an ordinarily prudent man would not anticipate an injury to another person from his act such injury thence arising from his failure to take precautions to prevent it, is not actionable negligence in cases where reasonable care only is required.

4. RAILROADS: Duty of Track Repairer: Trainmen May Expect Clear Track: Humanitarian Doctrine. It is the duty of track repairers to maintain a clear track, so far as their personal safety is concerned, by taking necessary precautions in

guarding against injuries from trains being operated on such tracks. Therefore the servants operating such trains have a right to expect a clear track and are ordinarily not required to keep a watch along the track to prevent injury to track repairers.

5. ————: **Warning to Section Men: Station Signals.** Section men are supposed to look out for their own safety. The character of their work is a warning to them to be on the lookout. The statutory warning by bell or whistle does not apply to them, and the common law did not require a warning.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields*, Judge.

REVERSED.

*Carter, Collins, Jones & Barker, S. H. West* and *Roy F. Britton* for appellant.

(1) A clear case of contributory negligence on the part of the deceased was shown by the evidence, and the case should not have been submitted to the jury. Degonia v. Railroad, 224 Mo. 564; Sissel v. Railroad, 214 Mo. 515; Cahill v. Railroad, 205 Mo. 393; Brock-schmidt v. Railroad, 205 Mo. 435; Evans v. Railroad, 178 Mo. 508; Wheat v. St. Louis, 179 Mo. 572; Mc-Grath v. Railroad, 197 Mo. 97; Clancy v. Railroad, 192 Mo. 615; Davies v. Railroad, 159 Mo. 1; Loring v. Railroad, 128 Mo. 349; Sharp v. Railroad, 161 Mo. 214; Fore v. Railroad, 114 Mo. App. 554; Riccio v. Railroad, 189 Mass. 358; Aerkfertz v. Humphries, 145 U. S. 418. (2) The appellant was not guilty of negligence. Henze v. Railroad, 71 Mo. 638; Sullivan v. Railroad, 72 Mo. 195; McGrath v. Railroad, 197 Mo. 105; Isaacs v. Skranka, 95 Mo. 523; Young v. Railroad, 227 Mo. 307.

*Benjamin F. Clark, Goodman & Breitenbach* for respondent.

(1) Under the humanitarian doctrine, under which theory this case was tried, the plea of contrib-

utory negligence is no defense, as it is conceded that the plaintiff's deceased was guilty of contributory negligence; but the defendant's negligence in not avoiding the injury to Casimer Hitz after defendant's servants saw, or by the exercise of ordinary care could have seen, Casimer Hitz's peril, constitutes the proximate cause of the injury, for which defendant is liable in damages. Murphy v. Railroad, 128 S. W. 481; Matz v. Railroad, 217 Mo. 299; Kinlen v. Railroad, 216 Mo. 164; Johnson v. Railroad, 203 Mo. 400; White v. Railroad, 202 Mo. 539; Hinzeman v. Railroad, 182 Mo. 611.

(2) The jury are the sole judges of the facts adduced by the testimony, and in addition to the oral testimony introduced at the trial, the jury, in arriving at their verdict, were at liberty to base their finding on the physical facts as evidenced by the photographs and the plat introduced. Whether or not the engineer or fireman saw, or could have seen the deceased, Casimer Hitz, and members of the section gang after passing the Grand Crossing in time to have stopped the train after so seeing the men on the track, and before the injury occurred, was a question which the jury could decide upon the evidence of the physical facts as shown by the photographs and the plat, although the oral testimony tended to show that the engineer could not have seen the section gang. State v. Dettmer, 124 Mo. 426; State v. Arnold, 206 Mo. 589; Champagne v. Hamey, 189 Mo. 709; Ross v. Railway, 113 Mo. App. 600; Barrie v. Transit Co., 102 Mo. App. 87; Richmond v. Railroad, 133 Mo. App. 470.

STATEMENT.—This was an action commenced in the circuit court of the city of St. Louis to recover damages on account of the killing of Casimer Hitz, an assistant foreman of a crew of section men engaged in working in and about the Union Station Yards in the city of St. Louis, Missouri. The suit was brought

by the plaintiff as the widow of the deceased. Upon trial, the plaintiff obtained judgment for the sum of four thousand dollars, from which the defendant perfected an appeal to the St. Louis Court of Appeals. The cause was thereupon transferred to this court, and the parties by their respective attorneys, before the argument, expressly waived the question of the jurisdiction of this court to hear and determine the cause and the same was submitted on this agreement.

The plaintiff stated for her cause of action that the agents and servants of the defendant while in charge of its train and running upon its track, negligently ran upon and killed Casimer Hitz; that defendant's servants wholly and negligently failed to ring the bell or sound the whistle to warn the said Casimer Hitz and the men of his crew of the approach of the train, and failed and neglected to have the headlight burning on the front of the engine to warn the said Casimer Hitz and his crew. It is further alleged that the servants and agents of the defendant company saw Casimer Hitz while in a dangerous and perilous position or could by the exercise of ordinary care have seen him and warned him of the impending danger, or could have brought the train under their charge to a stop before said train ran upon and against the said Casimer Hitz and thereby averted the fatal injury. There were also charges of negligence against the Terminal Railroad Association of St. Louis, which was made a joint defendant with the appellant herein, but the plaintiff took a non-suit as to such defendant and it is therefore unnecessary to set out the charges of negligence against it.

The answer, besides a general denial, set up a plea of contributory negligence, charging, among other things, that on said occasion the said Casimer Hitz was negligently and carelessly upon said track and carelessly and negligently failed to look and listen for the approach of the engine and cars when by looking he might have seen, or by listening might have heard an

engine and cars approaching, and thus have avoided the injury.

The plaintiff's reply was a general denial.

The accident occurred in the Union Station Yards of the Terminal Railroad Association of St. Louis, at about ten o'clock on the evening of December 26, 1907. The evidence tended to show that it was a clear, still, warm night, the moon and stars shining, hardly any wind, no fog, and the atmosphere not clouded in any way. The accident occurred at or near cross-over track No. 171, which was to the north and east of tower No. 1, and led from track No. 38 to track No. 39, all of which has been made clear by photographs reproduced in the abstract. The Union Station Yards were owned, controlled and operated by the Terminal Railroad Association, which controlled or managed all trains inbound or outbound over its tracks to and from the Union Station in the city of St. Louis. All the railroads entering St. Louis, twenty-seven or twenty-eight in number, used these yards as a passenger terminal. About two hundred and eighty passenger trains went in and out of the train-shed daily. In addition, engines of the Terminal Association and of other railroads frequently passed over the tracks. In the train-shed of said yards were thirty-two tracks, the trains were drawn into and out of the train-shed over a system of main leads or tracks. The movement of trains, as we have said, was under the control of the Terminal Association, which directed the movement by means of an interlocking plant and signals operated from tower No. 1. The complicated nature of the yards and the system of tracks in said yards on the night in question is clearly shown by the photographs in the abstract. Tower No. 1, in those yards, faced the train-shed, and there were no obstructions between tower No. 1 and the train-shed, nor between the point at which the accident occurred and the train-shed, except only the supports of the several bridges and possibly some of the electric light poles

located in the yards. The train of the defendant which is supposed to have struck deceased and caused his death, on the night in question left the train-shed from track No. 7 therein, and under the direction of the Terminal proceeded out under bridge No. 3 and bridge No. 5 on to the main track—No. 38—and then under bridge No. 8, over the grand crossing, past the place of the accident, and out of the yards.

The deceased was an employee of the Terminal Association. Oliver Johnson was the foreman of the terminal yards at tower No. 1, and Casimer Hitz was his assistant foreman, but Hitz at the time of the accident, in Johnson's absence, was acting as foreman. He frequently so acted. The members of the gang under his charge that night were five in number; Kelly, Lyons, Keating, Dougherty and Eberle. Just prior to the time the accident occurred, Hitz and the five men composing the gang had been at work repairing the track known as cross-over track No. 171. Their work was practically completed, there being only two more spikes to drive. Lyons, Eberle and Kelly were engaged in that work. Lyons, standing with his back to bridge No. 8, was engaged in the act of driving, or was about to drive these spikes, and Kelly was holding a torch down in front of Lyons towards the track for him to see the spikes. Hitz was standing in track No. 38 with a lantern in his hand, doing nothing at the time. He was not doing any of the actual labor. The lantern held by Hitz was a regular railroad lantern, such as trainmen use. He was standing some distance farther from the grand crossing (probably twenty feet) than Kelly and Lyons, facing sideways in the track. While Lyons had his back to the oncoming train, Hitz had his left side to it, his back towards tower No. 1, and he was facing approximately toward the train-shed. The other section hands were in the immediate neighborhood. The place where Kelly and Lyons were working was about one hundred and twenty-five feet from the grand crossing, and about

eight hundred feet from the entrance to the train-shed. The grand crossing, referred to in the evidence, was the point where three main tracks, numbered 41, 42 and 43, crossed three other main tracks, numbered 37, 38 and 39. Over the grand crossing was located bridge No. 8, containing signal devices for directing movement of trains. The grand crossing and bridge No. 8 were immediately north of tower No. 1. The movement of trains was controlled by the Terminal from tower No. 1.

While the men were standing in the positions indicated, one of appellant's trains, consisting of an engine and five coaches, came out of Union Station and passed over track No. 38 and near the place where these section men were working and killed two of them, Casimer Hitz and Kelly. On the night in question, the evidence shows that one of appellant's regular trains left Union Station on its schedule time, at 9:55 p. m., and passed tower No. 1 at 9:57 p. m. Its locomotive was in charge of the usual and customary crew consisting of an engineer and fireman. The engineer was seated at his usual and customary place on the right hand side of the engine. According to his testimony, he was looking for signals from the Terminal, signals being displayed overhead from bridges 1, 3, 5 and 8. He knew nothing about the accident until the train was some distance out of St. Louis when he heard of it. The curve of the track was such that it was impossible for this engineer, from his proper place in the cab, to see the point at which this section gang was working. It was a sharp curve. The engineer could not see the track ahead of him or to his left. The testimony is undisputed that those in charge of the train did not see the section gang or any member of it, and did not know or hear of any accident until after the train had left St. Louis. The other member of the crew in charge of the engine was the fireman, George B. Clark. This witness was not found although appellant produced testimony that it had made efforts to locate him. The engineer stated

that after signals to start had been received from the conductor and they pulled out; the first thing the fireman did was to build up the fire. After that, the engineer was watching the signals above as he had to get a signal on bridges 1, 3, 8 and 14, and all the way out of the yards, so he did not watch the fireman and did not know what he was doing. The engineer stated that it was customary for the fireman, as the train left Union Station, to build up his fire and also watch for signals the same as the engineer. The testimony further showed that the bell was ringing from the time the train left Union Station, and as it passed tower No. 1, and until it reached Valley Junction, east of East St. Louis, Illinois; that the bell was an automatic bell and when once started rings until it is shut off, and that it was not shut off on the night in question until the train reached Valley Junction. One of the witnesses who was asked whether the bell was ringing said: "Well, the way that is, there are so many engines and trains running around there, some ringing the bells sometimes—very seldom though; sometimes they don't. We don't pay any attention to them. There are too many. There are trains there all the time. We don't pay any attention."

There was evidence for the plaintiff tending to show that the headlight on the front of the engine was not turned on. The engineer testified that the engine was equipped with an electric headlight which threw good light "for four or five telegraph poles;" that he turned it on just as the train reached tower No. 1, that is, at a place where it would not shine on the tower; that this was the usual custom; that he was under instructions from the Terminal to leave the headlight out until he could use it so that it would not shine on tower No. 1, because it interfered with the trains backing in the shed and also the men in the tower; that this instruction was observed on the night in question; that on such occasions there was substituted for the headlight a red light put on the pilot beam of the engine, this being

for the benefit of the men in the tower and passenger trains backing into the shed, and that such light was taken off when the headlight was turned on.  This train was running from eight to ten miles an hour; there is no conflict in the testimony as to the rate of speed. Likewise, all the testimony was that this was the usual and customary rate of speed for a train leaving Union Station and passing through the Union Station Yards. The engineer testified that the train might have been stopped in a space of about sixty or seventy feet, under the circumstances appearing in evidence.

The evidence disclosed that the yards in question were free of obstructions, except as hereinbefore stated, and that they were well lighted.  There were arc lights scattered throughout the yards.  One could see a long ways off—four or five hundred feet, and at the tower, one could see a train pulling out of the train-shed.

At the time of the accident, there was no work of any kind requiring Casimer Hitz to be on track No. 38, or to engage his attention to any other thing than watching out for himself and the members of his crew. There was evidence that it was Hitz's custom, when acting as foreman, to call, "Get out of the way" and "Keep out of the way."  That "he was a pretty good watchman, too, most of the time; a good hand to watch, always warning the boys, saying, 'Look out, boys, don't get too close.' "

Deceased was a man fifty-five years of age and was at the time of his death acting as foreman over five section men as we have stated.  The evidence tended to show that the members of the track repairing gang expected the foreman to look out for the members of the gang while they were at work; that they did not know at what time a train might be coming and that they customarily relied on the foreman to give warning, and that when a train was coming it was Hitz's custom to warn the men by calling to them to get out of the way. The work in which the men were engaged at or just

prior to the time of the accident was practically com-
pleted, there being only two more spikes to be driven;
about this time, one of the men called, "Look out, I
think there is a train on that track there." The engine
was then about twelve feet away and before Hitz and
Kelly could get out of the way it struck them. The engine
at this time had already come onto the frog that crosses
the train over from track 38 to track 39. One of the
men of the gang looked around, and seeing the engine
very near him, cried "jump" and he jumped as quick
as he could and got out of the way as did another of
the workmen. Kelly was killed. He was holding a
torch down as a light for a fellow-workmen to drive
the spikes. Hitz, as we said, was in the center of track
No. 38 and was not doing anything; he was holding a
trainman's lantern in his hand in order to look around
and see what was to be done. He was at the time from
fifty to seventy-five feet from the tower and one hundred
and seventy feet from the grand crossing and some eight
hundred feet from the train-shed. At the time of the
accident. Hitz was standing upright, motionless,
speechless, facing east, his left side toward the oncom-
ing train. He was a man of good hearing and good eye-
sight. He had been in the employ of the Terminal As-
sociation for many years and had been assistant fore-
man and acting foreman of the gang at the Union Sta-
tion Yards for a long time. The testimony showed that
the noise of the train going over the grand crossing was
heard by several witnesses. Lyons, one of the workmen,
testified that he heard the noise, but didn't pay any at-
tention to it because he looked to the foreman to warn
him. He heard Keating call "Look out," and jumped
out of the way. Keating saw the train as it was going
over the grand crossing from one hundred and twenty
to one hundred and fifty feet away and cried out to the
members of the gang, "Look out over there." The torch
held by Kelly gave a good light. At the time of the ac-
cident, he was holding it down near the track. Lyons

was between the torch and the approaching train. Lyons, Kelly, Eberle and possibly one other were between Hitz and the approaching train.

The foregoing is the substance of the testimony adduced at the trial.

NIXON, P. J.—It is conceded by both parties that the only question for determination on this appeal is the liability or non-liability of the defendant by reason of the humanitarian or last chance doctrine. Respondent states in her brief that the case was tried and submitted on the humanitarian or last chance doctrine. Her instructions were based on that theory, and the judgment must stand or fall by reason of that theory, as the jury had no other ground on which to base its verdict.

At the conclusion of the evidence, the defendant tendered to the trial court an instruction in the nature of a demurrer to the evidence. The court, in denying this instruction, gave as authority for its action the decision in the case of Hinzeman v. Mo. Pac. Ry. Co., 182 Mo. 611, 81 S. W. 1134. About this same date, the Supreme Court delivered an opinion in the case of Degonia v. St. Louis, I. M. & S. Ry. Co., 224 Mo. 564, 123 S. W. 807, in which it expressly overruled the Hinzeman case. In justice, however, to the learned trial judge, it may be said that the Degonia case could not have been considered by the trial judge for the reason that it was not reported until some time after this case was tried. It will thus be seen that the only question which confronts us is the propriety of the trial court's refusal to give defendant's peremptory instruction tendered at the close of all the testimony.

The testimony of the four surviving members of the gang of men under Hitz's charge, all of whom were immediately present at the time of the collision, is in substantial accord as to the basic and controlling facts

and there is no serious controversy between plaintiff and defendant as to the salient facts.

In considering the question of negligence, it is a truism that an ordinarily prudent man would not take precautions to guard himself against a danger which he could not reasonably anticipate. What a reasonably prudent man would anticipate, when required to act under a given state of circumstances, is the legal measure of liability for negligence; and when an ordinarily reasonable and prudent man would not anticipate an injury to another person from his act, such injury thence arising from his failure to take precautions to prevent it is not actionable negligence in cases where reasonable care only is required. The application of these fundamental principles to the facts of this case will resolve the question of the defendant's liability. If the servants and agents of the defendant company, charged with the responsibility of the operation of the train, had a right to anticipate a clear track at the place where the accident occurred, then they were not in duty bound to keep a watch along the track in front of the train, and there would be no negligence as negligence and duty are correlative. Whether they had the right to expect a clear track would depend on the ancillary question whether track repairers are required in law to maintain a clear track, so far as their personal safety is concerned, by taking necessary precautions and protecting themselves from injuries that might befall them by reason of trains being operated on such tracks. When all the evidence in this case is viewed in the most favorable light for the plaintiff, under the controlling decisions of our Supreme Court in the cases of Degonia v. Railroad, supra, and Van Dyke v. Railroad, 130 S. W. 1-8, the plaintiff failed to make out a case which authorized its submission to the jury, and defendant's demurrer to the evidence should have been sustained. To demonstrate this conclusion, we will now proceed to trace the parallelism between this case

and the Degonia and Van Dyke cases and apply the principles of those cases to the determination of the present one.

In this case, as in the Degonia case, the question was as to the negligence of track repairers and the court said: "Because section hands may be scattered along the railroad tracks from one station to the other, does not deprive the defendant of the right to rely upon a clear track, and this for the reason that such employees are bound to look out for their own protection. The rule as to an employee is different from the rule as to a passenger or stranger." [Cahill v. Railroad Co., 205 Mo. l. c. 408, 103 S. W. 532; Evans v. Railroad, 178 Mo. l. c. 517, 77 S. W. 515.] "It is well known to all that section men often remain upon the track until the train is dangerously close, and then by a quick step put themselves in the clear. The engineer has a right to rely upon such fact, as well as the further facts that such men know the time of trains and are expected to protect themselves. For these reasons the rule invoked —the humanitarian rule—cannot be applied in all strictness to section men, as held by this court and the United States Supreme Court." [Degonia v. Railroad, supra, l. c. 592.]

As to whom the statute providing for the giving of signals is to apply is well expressed by MACFARLANE, J., in Burger v. Railroad, 112 Mo. l. c. 246, 20 S. W. 439, thus: "It is argued, we think correctly, by counsel for defendant, that the duty of giving the statutory signals of ringing the bell or sounding the whistle, has no application to one, situated as plaintiff was, in the middle of the train and between two cars, but was intended to give warning of the approach of a train to persons who might be crossing, or intending to cross, the railroad over a public highway. Indeed, the language of the statute admits of no other construction."

Continuing, the court in the Degonia case, said: "Now under the evidence and the law is thus far ap-

pears, (1) that defendant had a right to expect a clear track at the point of injury, and under no theory of the law can it be held liable unless defendant's servants actually saw deceased in a perilous position, and further saw that he was oblivious to such perilous position, in time to have averted the injury by the exercise of ordinary care, (2) that as to deceased there was no negligence in failing to whistle for the crossing or to ring the bell thereafter, and (3) that the servants at such place were not compelled to be on constant watch for persons on the track at such place."

In Riccio v. Railway Co., 189 Mass. 358, where the deceased was shoveling snow in the switch yards of the defendant with snow still falling and was struck and killed by an engine, the Supreme Court of that state said: "We see no negligence on the part of the defendant. The plaintiff (deceased) knew that he was at work in a railroad yard where trains and engines are frequently passing. There was no undertaking on the part of the defendant to give him warning, but he was expected to look out for himself. If the engineer failed to sound the whistle or ring the bell, it was not negligence for which the defendant was responsible. Both by the common law, and by the law of the State of Connecticut as we understand it to be under the decisions of that state which were put in the case as evidence, there is no evidence of negligence of the defendant. [Morris v. Railroad, 184 Mass. 368; Whittlesey v. Railroad, 77 Conn. 100, and cases cited.]" The above language was quoted and approved by our Supreme Court in the case of Cahill v. Railroad, 205 Mo. l. c. 411, 103 S. W. 532.

During the discussion of the Degonia case, our Supreme Court also said: "There can be no negligence without there being some duty to be performed toward the injured party. The Massachusetts court puts it well. When a section man is employed, the character of his work is a warning to be upon the lookout. As

said by that court, the common law does not demand warning and in Missouri we have no statute demanding such, then wherein comes the rule of law announced in the Hinzeman case. In Aerkfetz v. Humphreys, 145 U. S. l. c. 419, Mr. Justice BREWER says: 'Upon these facts, we observe that the plaintiff was an employee, and, therefore, the measure of duty to him was not such as to a passenger or a stranger.' "

As said in the case of Evans v. Railroad, 178 Mo. l. c. 517, 77 S. W. 518, referring to the humanitarian rule: "It will not do to apply this rule in all its strictness to section men whose business it is to work upon and keep in repair railroad tracks, for they are supposed to look after their own personal safety, and to know of the time at which trains pass, to look for them and see them, and to move out of the way. It is of common knowledge that these men often voluntarily wait until trains get dangerously close to them, and then step out of danger and let them pass by, and to require trains to stop upon all such occasions, when section men are discovered at work on the track, would not only be imposing upon railroads unjust burdens, but would greatly interfere with traffic and travel. Those in charge of trains have the right to presume in the first place that such persons will keep out of danger, and not until they have good reason to believe they will not do so, and then fail to use all proper means at their command to prevent injuring them, in consequence of which they are injured, or are injured by reason of the willful negligence of those in charge of the train, should the defendant be held liable, . . ."

The court in the Degonia case summarizes its conclusions and overrules the principles announced in the Hinzeman case in these words: "The essence of these cases, which in my judgment conflict with the Hinzeman case, supra, is (1) that the humanitarian doctrine cannot be applied in its strictness to employees working on the road, and that as to them the rule is differ-

ent from the rule as to passengers or strangers; (2) that it is the duty of the employee working on the track not to place himself in such position that he cannot see an approaching train, and if he does so place himself he is guilty of such negligence as will preclude his recovery although defendant's servants failed to warn him; and (3) that it is the trackman's duty to protect himself from approaching trains and not permit himself to become so engrossed in his work as will prevent him from protecting himself."

The evidence in the case at bar tended to show that the members of the track gang when at work in the Terminal Yards expected the foreman or person in charge of the gang to look out for their safety while they were at work; that they did not know the time a train might be coming and that they customarily relied upon the foreman to give warning; that when a train was coming, it was Hitz's custom to warn the men of its approach. At the time of the accident, Hitz was in the center of track No. 38 and was doing nothing but standing there holding a trainman's lantern in his hand in order that he might look around and see what there was to do. He was fifty or seventy-five feet from the tower and some one hundred and seventy feet from the grand crossing and some eight hundred feet from the train-shed. He was standing upright, motionless, speechless, facing east, sideways to the direction in which the train was coming. The illumination in the Terminal Yards was such that one could see four or five hundred feet. Hitz was a man of good hearing and good eyesight. Had he looked, he could have seen; had he listened, he could have heard. He had been in the employ of the Terminal and had been assistant foreman of the gang in the Union Station Yards for a long time. There was no evidence that the engineer saw him, but on the contrary the train crew did not see him. From the evidence it also appears that Hitz paid no attention to the approaching train. With all this

Fuel Co. v. Bean.

before him, with the imposed duty resting upon him of watching for his own safety as well as that of the men under his charge, and while in this place of peril, with the train approaching, he paid no attention to his surroundings and the certain fate that awaited him. The facts in every essential particular bring this case clearly within the principles announced in the Degonia case, and, as said in that case, under the weight of authority in this state, plaintiff is precluded from a recovery herein because of the negligence of the deceased, and as we view the law and the facts, the humanitarian rule in none of its phases has any place in this case. As said by Judge Fox in the case of Van Dyke v. Railroad, 130 S. W. l. c. 9: "While this accident, like all others of a similar character, enlists our sympathy and was strikingly unfortunate, yet, if we are to follow the well-considered adjudications upon this proposition, we repeat that there is no escape from the conclusion that the plaintiff in this cause is not entitled to recover." The judgment is accordingly reversed. All concur.