TANNER v. MISSOURI PACIFIC RAILROAD COMPANY, Appellant.

Division One, March 29, 1901.

1. **Negligence**: LOOK AND LISTEN: WANTONNESS: DEMURRER. In a suit for personal injuries caused by a train running at a rate of speed exceeding the maximum rate permitted by city ordinance, the court should commit the case to the jury unless the undisputed facts establish such contributory negligence on the part of the person injured as will preclude a recovery. And there being nothing in the conduct of those in charge of the train to indicate a willful, reckless or wanton disregard of human life, such contributory negligence is established by undisputed evidence clearly showing that an adult man, well acquainted with the tracks and the usual time of arrival of trains, of good hearing and eyesight, deliberately placed himself on the track of an incoming train, and neither listened nor looked, when by so doing he could have avoided the accident. In such case, a demurrer to plaintiff's case should be sustained.

Vol 161 mo—32

Tanner v. Missouri Pacific Ry. Co.

2. ———: ———: BULLETIN ANNOUNCEMENTS: NO EXCUSE. No person has a right to shut his eyes, close his ears, and put himself in a place of danger on or near a railroad track on the faith of the announcement of the bulletin boards as to the arrival of trains. They do not excuse him from the duty of looking and listening for trains in crossing the tracks, even though he crosses them at a public crossing at the station within an incorporated city.

Appeal from Pettis Circuit Court.—*Hon. George F. Longan,* Judge.

REVERSED.

*M. L. Clardy* and *William S. Shirk* for appellant.

The court erred in refusing to sustain defendant's demurrer to plaintiff's evidence, offered at the close of plaintiff's case: First. Plaintiff was not upon defendant's depot grounds for the purpose of transacting any business with it. He was there as a runner for a hotel, solely in his master s private business. He was there in defiance of the rules, regulations and orders of the defendant, and was therefore a trespasser, and defendant was not bound to be on the lookout for him. Post v. Railroad, 23 S. W. 708; Elliott on Railways, sec. 1252, p. 1957, et seq; sec. 1256, p. 1966; sec. 200, n. 6, p. 285; Hall v. Power, 12 Metc. 482; Landrigan v. State, 31 Ark. 50. Second. This case does not belong to that class of cases, where persons are on the tracks by license, or invitation of a railroad company, as in Scoville v. Railroad, 81 Mo. 434, and the Frick and Kelly cases in 75 Mo. There never was any acquiescence on the part of the railway company, in the use of this place by the hotel porters, and the evidence in this case shows that defendant's employees had no knowledge or notice, that hotel porters were in the habit of standing where plaintiff was injured. Hence, the defendant was only liable, if they actually

saw the plaintiff in a perilous situation, and then failed to do all they could to avoid injuring him. And there is no evidence to this effect, whatever. Williams v. Railroad, 96 Mo. 275; Rine v. Railroad, 100 Mo. 228; Hyde v. Railroad, 110 Mo. 272; Barker v. Railroad, 98 Mo. 53, 54. Third. His own evidence plainly showed that he was guilty of gross contributory negligence. Relying upon some statement which he heard made, that numbers nine and ten were both marked on the bulletin board, "on time," and that therefore number ten would not be in for about seven minutes, he walked across the track upon which he knew number ten would come in, and stood on the track or very close to it, for a minute and a half, or two minutes, until struck by the engine of number ten. During these two minutes he stood with his back towards the west, from which direction number ten was coming, with his umbrella raised over his head, and amidst the noise made by hackmen and porters, and neither looked or listened to see or hear if number ten was approaching him. He admits that "if he had looked he must have seen, and if he had listened he must have heard." "He directly contributes to his own injury, who, paying no attention to his own safety, trusts to the obligation imposed upon the company to warn him of an approaching train." Turner v. Railroad, 74 Mo. 607; Bogg v. Railroad, 138 Mo. 172; Stepp v. Railroad, 85 Mo. 229; Henze v. Railroad, 71 Mo. 562; Elliott on Railways, sec. 1166 and note, p. 1776; Beach Contrib. Neg., sec. 37 and notes; sec. 181 and notes; Kries v. Railroad, 148 Mo. 321. Fourth. And the fact, if true, that defendant's servants running the engine, did not ring the bell, was no excuse for this negligence on plaintiff's part. Kries v. Railroad, 148 Mo. 321; Corcoran v. Railroad, 105 Mo. 399; Dlauhi v. Railroad, 105 Mo. 645; Caldwell v. Railroad, 58 Mo. App. 453; Hayden v. Rail-

road, 124 Mo. 566; Kelsay v. Railroad, 129 Mo. 362; Baker v. Railroad, 122 Mo. 533.

*J. H. Rodes, Sangree & Lamm* and *Barnett & Barnett* for respondent.

The demurrer to the evidence was properly refused. The respondent was not on the railroad's private property but upon a street crossing, where Osage street crosses the railroad tracks and leads up to the depot. The railroad company recognized this as a public crossing, and the right of the public to use it, as such, by putting in walks between and across tracks for the use of the public in crossing, in going to and from the depot and the trains, and the public, including plaintiff, had the right to go upon this crossing, and the railroad company (even if it attempted to do so) had no right to exclude plaintiff from this crossing, and therefore plaintiff was not a trespasser in being there. The crossing is designed for the use of the public, and the right of the railroad to use its tracks is no greater than the right of the plaintiff to use the crossing extending across the tracks to the depot. Baker v. Railroad, 147 Mo. 140; Nixon v. Railroad, 141 Mo. 425; Hanlon v. Railroad, 104 Mo. 381; Dlauhi v. Railroad, 105 Mo. 645; Burger v. Railroad, 112 Mo. 238; Schmitz v. Railroad, 119 Mo. 256. (a) Even though this crossing was not a public crossing, but private railroad property, still, the plaintiff would not be a trespasser in being where he was when struck, because the public were licensed to and did use this place as a crossing. The public constantly crossed and recrossed there, many hundreds every day, and porters and hackmen stood at this place and plied their trade there with the full knowledge and without objection on the part of the defendant. Hence, the public generally being licensed to be at this place, plaintiff was not a trespasser. Williams v. Railroad, 96 Mo. 275; Guenther v. Rail-

road, 108 Mo. 18; Le May v. Railroad, 105 Mo. 361; Lynch v. Railroad, 111 Mo. 601; Easley v. Railroad, 113 Mo. 236. (b) Plaintiff went to the trains on proper and legitimate business; that is, to meet and attend to the wants of passengers alighting from said train, but if he had no business there, and if the place where he stood is to be regarded not as the street crossing but a part of defendant's platform, still, plaintiff was not a trespasser and the company is bound to exercise ordinary care to prevent injury to him. Hicks v. Railroad, 64 Mo. 430. One is not a trespasser who has been accustomed to go upon the company's property with its tacit permission. Guenther v. Railroad, 108 Mo. 18; Le May v. Railroad, 105 Mo. 361; Lynch v. Railroad, 111 Mo. 601. (c) But, assuming that the company had the right to prevent hotel runners from plying their vocation at this place, that is, on the crossing south of the trains, yet there is not a particle of evidence that the company ever objected to plaintiff or other hotel runners plying their vocation at this place, although the company's officers had knowledge of the custom to solicit guests for hotels on the south side of the tracks. (d) Assuming, in the face of all the evidence to the contrary, that defendant had a right to a clear track, yet the injury occurred at a place where, by reason of the usual presence of people there, it did not have a right to anticipate a clear track. Therefore, the employees of said train were bound to be on the lookout for persons at this point, and if they discovered, or by the exercise of care could have discovered, plaintiff's peril in time to have avoided the injury, then the defendant is liable, and for this reason the demurrer should have been refused. Williams v. Railroad, 96 Mo. 275; Fiedler v. Railroad, 107 Mo. 645; Frick v. Railroad, 75 Mo. 595; Dlauhi v. Railroad, 139 Mo. 291; Baird v. Railroad, 146 Mo. 265; Hilz v. Railroad, 101 Mo. 36;

Guenther v. Railroad, 95 Mo. 286.   (e)   The law requires
that the greatest diligence, watchfulness and care be observed
by those running and operating trains in towns and cities,
especially over streets and other public places therein.   Burger
v. Railroad, 112 Mo. 238; Brown v. Railroad, 50 Mo. 461;
Powell v. Railroad, 59 Mo. App. 626.   And when running
at an unusual time of night, as in this case, unusually great
precautions should be observed, and the care required must
be commensurate with the danger.   Karle v. Railroad, 55 Mo.
476; Frick v. Railroad, 75 Mo. 595.   (f)   The demurrer
to the evidence should not have been sustained on the ground
of contributory negligence, because even if plaintiff was guilty
of negligence in being where he was, yet if defendant's ser-
vants could have discovered his peril in time to have avoided
the injury, then the defendant is liable, notwithstanding plain-
tiff's contributory negligence, and it was the duty of the court
to submit this question to the jury.   Dlauhi v. Railroad, 139
Mo. 291; Baird v. Railroad, 146 Mo. 265; Williams v. Rail-
road, 96 Mo. 275; Fiedler v. Railroad, 107 Mo. 645; Frick
v. Railroad, 75 Mo. 595.   (g)   But it was a question of fact
for the jury to say under all the circumstances detailed in evi-
dence whether plaintiff was guilty of contributory negligence.
For any one and all of the foregoing reasons, the court did
right in refusing to give the instruction in the nature of a de-
murrer to the evidence.

BRACE, P. J.—This is an appeal by the defendant from
a judgment of the circuit court of Pettis county in favor of the
plaintiff for the sum of seven thousand dollars, for personal
injuries, which, it is alleged in the petition, was caused by the
negligence of the plaintiff in running its train at a rate of speed
in excess of that allowed by city ordinance and without ringing
its bell.   The answer was a general denial, and a plea of con-

tributory negligence. At the close of plaintiff's evidence, the defendant demurred thereto, and at the close of all the evidence renewed its demurrer, and now insists that the trial court committed error in not sustaining the demurrer. This contention makes it necessary to determine the undisputed facts in the case, and if upon them, it is well grounded, the necessity of considering the other errors assigned is obviated.

The accident occurred on the second day of March, 1897, between one and two o'clock a. m. on the grounds of the defendant in front of its depot in the city of Sedalia. The depot fronts south, with a wooden platform extending south to the tracks. Along and in front of the platform and on a level with it, are located five tracks running east and west, numbered 1, 2, 3, 4, 5, from the platform, which extends across and between two or three of the tracks. South of the tracks and in front of the depot, Osage street, sixty feet wide, running north and south, abuts the depot grounds, and forms one of the principal approaches to the station, to reach which all five of these tracks must be crossed. On the northwest corner of Osage street, fronting the depot grounds and tracks, is the Pacific Lunch Room. On the night in question the plaintiff was in the employ of the City Hotel as night clerk, and discharging the duties of porter for that hotel. Passenger train number nine coming from the east on track number one was due at 1:43 a. m. Passenger train number 10, coming from the west on track number two, was due at 1:50 a. m. The track is straight and level and the headlight of a coming engine on it, can be seen a half mile from the place of the accident. The bulletin board showed these trains on time. In fact, number nine came in about five minutes late, and number ten on time. The plaintiff, in the line of his employment, was in the Pacific Lunch Room awaiting the arrival of these trains. The story of his injury is told by him in his evidence as follows:

## *In Chief.*

Q. You may state what you did after you got there, to the lunch room, how long you stayed there and how you came to go there, if you did, to meet number nine? A. I went over and went in the side door to the lunch room, where we generally stopped out of the rain or cold weather, and stop in there occasionally when the train is not in sight or hear it coming; we drop inside there at the restaurant, and step in there and talk a few minutes until the train comes, and we was all standing in there talking. Some one said the train was coming—

Q. Had there been anything said in there about the bulletins of the two trains before that? A. Well, it was reported, "Number nine on time."

Q. How about number ten? A. Both on time; that was the report.

Q. Marked where, at the bulletin at the depot? A. Yes, sir; I didn't go over myself, but it was reported there amongst the hack-drivers and the porters that number nine and ten was on time.

Q. Now go on in your own way? A. And when number nine was coming in, we heard it coming in, we all went out; I say all, several went out; some went out the side door and some the back; I went out the back door, and it was raining; you have to go east a little bit to get on the sidewalk, the back door of the restaurant, and I went north—

Q. Did you go east when you stepped out of the back door of the restaurant? A. Had to go east to get to the corner of the building, sidewalk.

Q. Then how did you go when you got to the corner of the building, to the sidewalk? A. I went north.

Q. Where did you go, north? A. I went north to the

platform between number one and two track, where number nine and ten runs in on.

Q.  How long were you in there before number nin? came in?  A.  Why, I just got there, and number nine came in.

Q.  From the east?  A.  From the east, by me.

Q.  Go on, from that, and, by the way, when you went across this track that number ten finally came in on, state whether you looked or not, if you looked?  A.  Yes, sir, I looked west.

Q.  Did you see anything that indicated a train coming?  A.  No, sir; nothing but some switch lights up there.  They don't give no such light as an engine, you know. . . . .

Q.  Then you crossed on over this track that number ten finally came in on, and got in between tracks number one and two?  A.  Yes, sir.

Q.  On which side of number nine were you when number nine came in?  A.  On the south side.

Q.  How wide is that platform between tracks one and two?  I don't mean when the trains are in, but before they come in, how wide is the space between the rails, give us your judgment.  A.  I couldn't say.

Q.  You never measured it, but give us your judgment about it?  A.  I judge, seven or eight feet there.

Q.  When trains come in, I suppose the cars project over the rails to some extent; how wide would the space be when two trains were standing in there, do you think.  A.  I judge it would be four or five feet.

Q.  Now, after number nine came in from the east you say you had your umbrella up?  A.  Yes, sir.

Q.  How did you hold your umbrella?  A.  Up over my head, it was raining.

Q.  What did you do after number nine came in?  I was standing there waiting for passengers to get off.

Q. Had you moved up east some? A. I may have stepped up a few steps. The smoking car is about middle-ways where I was standing.

Q. What do you mean by that, the smoking car? A. That is the first coach.

Q. And you mean that you were standing about the middle of the smoking car? A. Yes, sir; when the people were getting off.

Q. If we knew where that car stood we would be able to locate you; do you know where that car stood? A. I think it was partly across Osage. I was standing on the platform between Osage or on Osage.

Q. You think you were standing on that platform where Osage, if it went through, would have gone right where you were? A. Yes, sir.

Q. How long had you been over there before number ten came in? A. I had been standing there I guess a minute and a half or two minutes.

Q. What were you doing during that time? A. Standing there looking for passengers to get off.

Q. Were you on the track that number ten came in on, do you think? A. No, sir; I don't think I was on the track.

Q. What happened to you then? A. The train ran into me. Number ten run into me and took my leg off.

Q. Did you hear it before it struck you? A. No, sir.

Q. Did it ring any bell, the engine on number ten? A. No bell ringing.

Q. You never saw it before it struck you? A. No, sir.

Q. Which leg was it the train took off? A. Left leg.

Q. Do you know whether your leg was taken off after you was thrown down, or was it hurt before you fell down? A. I couldn't say. It was taken off; I didn't know how it was taken off.

Q. You were facing what direction when number ten struck you? A. I was facing northeast.

Q. Your right side would be towards number ten as it came in, in a measure? A. Yes, sir.

Q. You were facing northeast? A. Yes, sir; this direction.

Q. And that would bring your right side, in a measure at any rate, towards the track which was on the south of you? A. Yes, sir.

Q. Now it was your left leg that was cut off? A. Yes, sir.

Q. Whether you were knocked down, and after you were knocked down, your foot got under the car, or whether your foot was struck in the first instance you really don't know? A. Don't know how it was done, no sir.....

Q. When you were on this platform, that is, between these two tracks, do you remember of seeing other people in there at that time? A. The hack-drivers and porters was east of me; they were standing at the opening between the two cars.

Q. On which side of number nine? A. On the south side.

Q. Of number nine? A. Yes, sir.

Q. Standing east of you, as I understand you? A. Yes, sir.

Q. How far, I suppose you don't know? A. I couldn't say, how far east they were, they were down east; I wasn't paying any attention; I was watching to see who was going to get off the train.

Q. Mr. Tanner, while you had been standing over there as a porter, from time to time, on which side of the incoming trains, did you get passengers, and take passengers to the trains? A. To the south side.

Q.   South side?   A.   Yes, sir.

*On Cross-Examination.*

Q.   You were perfectly familiar with the manner at which these trains came in and at the time at which they came and had been for months before that?   A.   Before I was hurt, yes, sir.

Q.   You knew that number nine came in from the east seven minutes ahead of number ten from the west when they were both on time, you knew that fact?   A.   Yes, sir.

Q.   You say it was reported to you this night that you went over there that number nine was on time and number ten also?   A.   It was reported there in the restaurant, yes, sir.

Q.   As you went out after hearing number nine coming, did you look at your watch to see whether she was coming on exact time or not?   A.   I did not.

Q.   You thought it was coming in on time, from the report that you heard?   A.   That is what the bulletin board showed, I think.

Q.   But from what you heard in the saloon—?   A. Restaurant.

Q.   You thought it was coming in on time?   A. Yes, sir.

Q.   And you thought that number ten would not come in for the next seven minutes?   A. Of course number ten wouldn't come in for seven minutes......

Q.   Did you not also say that not expecting number ten for seven minutes yet, you was not looking for it, nor listening for it at the time you were injured?   A.   Was not looking for it.   If I had been looking for it I would have seen it before it got on to me.....

Q.   After you got across the track that number ten was coming in on, you say you stood there for a minute and a half

or two minutes before number ten came in? A. Yes, sir; number nine passed right by us.

Q. And in a minute and a half or two minutes after that, number ten came in and struck you? A. Yes, sir.

Q. During that minute and a half you was standing on that track that number ten came in on, did you turn and look out west to see if a train was coming? A. I don't remember whether I looked west any more than once or not.

Q. You think you looked west as you came across the track. Now in this minute and a half or two minutes after you got across the track did you again look west to see whether that train was coming? A. No, sir; I don't think I did.

Q. Did you listen to see if you could hear it? A. No, sir; I didn't expect it.

Q. And therefore paying no attention as to whether it was coming or not? A. I was standing there on the platform waiting for guests to get off. . . . .

Q. During the minute and a half that you stood there after you got across the track, and you say you was looking for passengers getting off of number nine, were you paying attention to whether or not train number ten was coming in from the west? A. No, sir; I was not. I didn't look; I didn't turn around and look. . . . .

Q. Were you looking? If you were not looking, were you listening? A. I was not deaf.

Q. Were you listening to see if that train was coming during that minute and a half you stood there on that platform; you were not, were you? A. I was not paying—I didn't hear anything. If I had heard it, of course—

Q. That is not the question. You understand what I mean. Were you listening, were your ears open to hear whether or not that train was coming? A. I didn't hear it; no, sir.

Q. You know that is not an answer to my question. . . . .

Were you listening with a special view to ascertain whether that train was coming or.not? A. Why, well, I'll have to say, I reckon I didn't. . . . .

Q. Anything the matter with your ears that night? A. No, sir.

Q. You can not explain why you didn't see that locomotive headlight? A. I can not explain it. I could have seen it if I had looked.

Q. You could have seen it if you had looked, and your eyes were all right? A. My eyes were all right, certainly.

Q. You didn't hear anyone hollowing at you on the other side of number ten. Was there anything the matter with your ears that night? A. No, sir.

Q. Your ears were in good condition? A. Yes, sir.

Q. You had an umbrella up over your head? A. I did.

As there was some evidence tending to prove that train number ten coming in on track number two was running at a rate of speed exceeding the maximum rate prescribed by the city ordinance, and that its bell was not being rung, the court committed no error in sending the case to the jury, unless by these undisputed facts such contributory negligence on the part of the plaintiff is shown, as to preclude a recovery. That it is so shown is a conclusion as to which reasonable minds can not well differ. The plaintiff, an adult in possession of all his faculties, familiar with the place, the time and movement of these trains, without looking or listening or paying any attention thereto whatever, deliberately placed himself in the line of danger of train number ten, coming in on track number two, on time, and is struck, when by looking he could have seen, and by listening he could have heard that incoming train, and have avoided the danger to which he thus voluntarily and unnecessarily exposed himself. A clearer case of contributory negligence could not well be made out. The only shadow of an

excuse for such negligence is that he had heard that the bulletin said that both trains were on time, and if this was so, then number nine having just come in, number ten would not be in for seven minutes. Hence he paid no attention to his danger from that train. He took no care whatever to verify this report, did not even look at his watch for that purpose. If he had, he would doubtless have discovered that number nine was in fact late, and that number ten was then nearly due. However that may be, while bulletins are required by law, and serve useful purposes, they can at best do no more than predict, suggest a probability, as to the arrival of trains, and no man has a right to shut his eyes, close his ears, and put himself in a place of danger on or near a railroad track on the faith of such a forecast. No reasonably prudent man will do so. Hence it must be held that the plaintiff was guilty of such contributory negligence, in being within the danger line of track number two, when he was struck, as to preclude a recovery, and that the court committed error in sending the case to the jury, *unless* after the plaintiff had thus put himself in a place of danger, the conduct of the defendant's employees in the management of the train was characterized by such willful, reckless, or wanton disregard of human life, as that the defendant shall not be heard to say that the plaintiff was guilty of such negligence. [Morgan v. Wabash Ry. Co., 60 S. W. 195; Kellny v. Mo. Pac. Ry. Co., 101 Mo 67.] We have looked in vain through all the evidence in this voluminous record, for *indicia* of such willful, reckless or wanton disregard of human life upon the part of defendant's servants. There was barely evidence enough to take the case to the jury on the main issues tendered by the plaintiff, and while there was some evidence from which the jury might have found that the train came into the depot grounds at a rate of speed slightly in excess of that prescribed by the ordinance, there is none to indicate a reckless rate of

speed.   It is also true that there was ample evidence from which the jury could have found that the place at which the plaintiff was struck, was plainly visible to the defendant's operatives on the engine, a sufficient distance for them to have safely stopped the train before it reached that place.   But conceding all this, what would have been seen by the defendant's servants at that place?   No person on track number two on which the train was moving.   The plaintiff and several other persons on the platform between that track and track number one, on which train number nine, was standing, presumably prudent persons, having a proper regard for their own safety, and if any of them were within the line of danger, from the approaching train, that they would be on the lookout for it, and would step out of its way as it approached them, and leave the way clear, and hence there would be no necessity for stopping the train on their account before reaching the usual stopping place some two or three hundred feet distant, where it did stop. This would have been the conclusion of an ordinarily prudent manager of the movement of such a train, and the defendant's servants thus managing the train in question can not be convicted of a willful, reckless or wanton disregard of human life, in not stopping the train before it reached the place where plaintiff was struck, because, forsooth, he proved to be an imprudent person without a proper regard for his own safety, and did not step out of the way of the train, as he might easily have done, and as he would have been reasonably expected to do.   The demurrer to the evidence ought to have been sustained.   Hence, it becomes unnecessary to consider the other errors assigned, and the judgment of the circuit court, for this error, will be reversed.

All concur, except *Marshall, J.,* absent.