EDNA WILLIG v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a Corporation, and E. W. FRITTS, Appellants.—137 S. W. (2d) 430.

Division Two, February 21, 1940.

706

*W. Wallace Fry, Frank B. Edwards* and *J. A. Lydick* for appellants.

708

*Hollingsworth & Francis* for respondent.

COOLEY, C.—The appeal in this case was originally taken to the St. Louis Court of Appeals where it was heard twice. On the first

hearing the judgment of the circuit court was affirmed in a unanimous opinion by the Court of Appeals. A rehearing was granted and the judgment was again affirmed, the opinion being written by BENNICK, Commissioner, and adopted by the court, but by a divided vote, BECKER, and McCULLEN, JJ., concurring and HOSTETTER, J., dissenting on the ground that he deemed the decision contrary to the decision of this court in Tanner v. Mo. Pac. Ry. Co., 161 Mo. 497, 61 S. W. 826, and requesting that the cause be certified to this court. Pursuant to constitutional mandate it was so certified here.

After careful examination of the record and consideration of the case we have concluded that said opinion of the learned commissioner of the Court of Appeals, approved and adopted by majority vote of that court, correctly disposes of the questions presented on the appeal and we adopt it as our opinion. It is as follows:

"This is an action by plaintiff, the widow, in which she seeks to recover damages for the alleged wrongful death of her husband, Clay Willig, who was struck and killed by a passenger train of defendant Chicago, Burlington & Quincy Railroad Company. One Fritts, the engineer in charge of the train, was joined with the railroad company as a defendant to the action. Tried to a jury in the Circuit Court of Audrain County, a verdict was returned in favor of plaintiff, and against both defendants, in the sum of $6,000. Judgment was rendered accordingly, and defendants' joint appeal to this court has followed in the usual course.

"The accident occurred at a point about four miles east of the city of Mexico, Missouri, where U. S. Highway No. 54 crosses over the track of defendant railroad company.

"The highway runs east and west, and had originally crossed the track, which runs from southeast to northwest, at the railroad grade level.

"In January, 1936, the Missouri State Highway Commission entered into a contract with the railroad company for the construction of an overpass or overhead crossing at the point where the highway crossed the track, and by the terms of the contract was granted permission to enter, or for its contractor to enter, upon the railroad company's premises and right of way for the purpose of completing the grade separation.

"Pursuant to this contract with the railroad company, the highway commission thereafter let the contract for the work to the C. H. Atkinson Paving Company, and work was begun on the job in May, 1936.

"Among the twenty or more men who were constantly employed on the project was the deceased, Clay Willig, who was hired by the Atkinson company as a laborer in August, 1936, and thereafter continued on the job until the following October 15th, when he was struck and killed by defendant railroad company's train.

"The overpass was to be constructed with a framework of steel beams or trusses supported upon concrete piers set in the slab of the original highway at intervals on either side of the track, and with earth filled in at either end of the main span of the overpass so as to permit the gradual elevation of the highway to its new level at the point of the crossing. During the progress of the work there was piling and falsework built in between the piers from the ground up to the floor of the overpass, and extending out, at least on the east side of the track, to a point within five and one-half feet of the nearest rail. This, together with the earthern fill at the end of the span, prevented one walking along the north side of the overpass from seeing the approach of a train from the east until he was within five and one-half feet of the track, although when that point was reached there was an unobstructed view down the track in either direction for a distance of a half mile or more.

"It was shown that during the entire period of the construction of the overpass no trains were regularly scheduled to run past the point during the forenoon, and, in fact, that the only train regularly scheduled to pass the point at any time during the daytime was a local freight which ran from Old Monroe to Francis in the early afternoon, and then made the return trip in the late afternoon. Whatever other trains occasionally went by during the daytime were special trains, of which, so far as the record discloses, there had been but very few during the whole of the time that the work had been in progress.

"Not only was it necessary that the construction company have certain of its equipment stationed on and around the right of way during the progress of the work, but in addition the duties of the men required them 'to go upon and over and along those tracks at all times of the day,' and so to the end that they might not 'get slipped up on,' arrangements were made, or it at least became the practice, for the railroad company's section foreman to provide them with information as to when any special trains would run. With respect to this feature of the case the most favorable view of the evidence from plaintiff's standpoint was that 'he (the section foreman) *always* came by on his motor car and told us when any special trains would be through.'

"About 7:00 o'clock on the morning in question the section foreman at Francis advised the Atkinson company's superintendent that there would be a couple of special trains through 'around noon' or 'about noon,' whereupon the superintendent, in accordance with his usual practice in such matters, communicated the information to the men on the job, including Willig, at some time between 7:30 and 8:00 o'clock.

"About an hour later, or around 9:00 o'clock, while Willig was working on the north side of the east approach to the overpass, he was directed by his foreman to get a bucket of cement out of the tool

or cement house which stood approximately one hundred fifty feet west of the railroad tracks, adjacent to the north side of the west approach to the overpass.

"In response to the foreman's direction, Willig took his bucket, climbed down a ladder on the north side of the east approach, and then upon reaching the ground level walked alongside the overpass towards the track which it was necessary that he cross in order to get to the cement house upon the west side of the right of way.

"As we have pointed out, the earthen fill and the falsework built in between the piers would in any event have prevented him from discovering the approach of a train from the east until he was within five and one-half feet of the track, though the undisputed fact was that even after he reached the point where looking would have been availing, he still did not look either to the east or the west, but instead stepped upon the track with his head down, wholly oblivious to the fact that a train was approaching from the east, and was then only two hundred feet back of him. It was also an undisputed fact that the whistle was being blown and the bell rung, though as it happened Willig was unable to hear either signal on account of the noise which was being made in connection with the riveting of the steel in place in the superstructure of the overpass.

"Instead of immediately crossing the track as he might have done, Willig turned to his right, and started to walk down the track between the rails in the general direction of the cement house. One of the workmen upon the overpass happened to see the train approaching, and realizing that Willig was oblivious to his peril, began to pound upon one of the steel beams in order to attract his attention. Hearing the unusual pounding, Willig glanced back towards the overpass, and becoming aware of his predicament as he did so, attempted to jump off of the track. Unfortunately his foot slipped in his hurry and confusion, and at that moment the train struck him, hurling his body down the track for one hundred thirty feet or more, and producing injuries so severe that he died in a very few minutes thereafter.

"The evidence disclosed that while the regularly scheduled trains always approached the overpass very slowly at a speed of from five to ten miles an hour, the train that struck Willig was running from forty to fifty miles an hour. Incidentally, this train was a special train, made up of fourteen coaches. Whether it was one of the two special trains that the section foreman had stated would be by 'around noon' was not revealed by the evidence. If so, then it came by approximately three hours ahead of the time that Willig had been led to expect its arrival, while if it was some other special train, then the section foreman in this instance had neglected to follow his established custom of 'always' giving the men information as to when any special trains would be through.

"The negligence pleaded and relied upon by plaintiff was the act of defendants in operating the train at a high and dangerous rate of speed under the circumstances of the case, to-wit, about forty miles an hour, as the train approached the point where the overpass was being constructed.

"The joint answer of defendants was a general denial of any negligence on their part, coupled with a plea of contributory negligence on Willig's part in having failed to look and listen for an approaching train before going upon and walking along the track.

"From the verdict and judgment for plaintiff, defendants have perfected their appeal to this court, where they contend as a matter of chief insistence that the court erred in overruling their respective demurrers at the conclusion of all the evidence.

"The sufficiency of the evidence to have shown actionable negligence on defendants' part presents no very serious question.

"Willig and the other employees of the Atkinson company were not only invitees upon the railroad company's premises and right of way pursuant to its contract with the highway commission (Hubbard v. Wabash Ry. Co. (Mo.), 193 S. W. 579), but they were engaged in the performance of work of a character which might require any one or more of them to be upon the track at any moment of the day. Conceding that by the time of the accident in question the work had progressed to a point where much of it was being done upon the superstructure of the overpass, there were still certain things to be done which required the presence of men upon and in. the immediate vicinity of the track. The cement house was of course located adjacent to the track, and so also was the air compressor, which stood underneath the overpass on the west side of the track, and furnished the power for the operation of the forge and the riviting hammer which were employed upon the superstructure in connection with the riviting of the steel in place.

"All this was unquestionably known to the railroad company, and in this situation it was the duty of the company and its employees to anticipate the presence of the men upon the track and to take such measures as ordinary prudence would dictate in order to prevent injury to them from its passing trains. [Hubbard v. Wabash Ry. Co., supra.] With warning signals largely unavailing because of the noise from the riveting of the steel, it was all the more important that the company should operate its trains past the point at a rate of speed which would be moderate and reasonably safe under the circumstances, since it was only by having the trains under adequate speed control that injury to one upon the track might reasonably be averted. As a matter of fact, the regularly scheduled trains customarily approached the point at a speed of only five or ten miles an hour, but not so with the special train in question, which was being operated at a speed of forty to fifty miles an hour and ran well beyond the scene

of the accident before it could be stopped. Under all these facts it was for the jury to say whether defendants were guilty of actionable negligence in the respect relied upon by plaintiff as the basis for her recovery, and so far as concerns this feature of the case, we think it is clear that the demurrers to the evidence were correctly ruled. [Hubbard v. Wabash Ry. Co., supra.]

■ "Indeed the fact is that defendants in their brief do not stress the question of the sufficiency of the evidence to have shown actionable negligence on their part, but rather insist that their demurrers should have been sustained upon the theory that plaintiff's own evidence had served to convict Willig of contributory negligence as a matter of law.

"Defendants base their argument upon the undisputed fact that Willig did not look to the east before stepping upon the track, when if he had looked he could and would have seen the train approaching in plain view, not more than four hundred feet away.

"It is indeed well settled as a general proposition of railroad law—and particularly so in crossing cases—that before one goes upon a track he must look and listen for approaching trains, and that if he fails to look and listen when to have done so would have enabled him to have seen or heard the train in time to have avoided being injured by it, then he is to be adjudged guilty of contributory negligence as a matter of law.

"Moreover this broad rule, in its usual application, is one which is founded upon both reason and necessity. Not only does the general public interest require that trains be permitted to make their runs with the least possible interference, but in the very nature of things they cannot be readily stopped, and so the initial burden is put upon the traveler to look out for their approach before allowing himself to get upon the track. Furthermore the general public cannot be made acquainted with train schedules, nor, for that matter, can established schedules always be maintained. The result is, therefore, that as to members of the general public, a railroad track is itself to be regarded as a signal or warning of danger, imposing upon the person who expects to go upon it the duty to exercise due care under the circumstances to protect himself against injury from the perils which the track may hold.

"But it is obvious, we think, that a rule which relates primarily to the care required of members of the general public as to whom 'it is always train time at a railroad crossing' may not invariably apply with all its exactness to one who is lawfully upon the track as an invitee of the railroad company, and relies (as Willig did) upon definite information and assurance which is given out by an employee of the company itself regarding the movement of its trains.

"Cases are not infrequent which take note of this distinction in more or less degree, but nowhere is it better expressed than in 52.

C. J. 680, where it is said: 'The rule that one going on or upon tracks must look and listen for approaching trains does' not apply with strictness to persons who are lawfully at work on or about cars or tracks. Since he has to rely on the railroad's taking proper precautions to avoid injuring him, such a person need only keep such a reasonable lookout for trains as is commensurate with the danger and consistent with the faithful performance of his work. Accordingly, he is not required to exercise the same lookout for passing trains as is required of a traveler on a highway crossing, or of employees not engaged in the duties of their employment; but a failure to exercise the care required constitutes contributory negligence. Where warned of an approaching train, it is his duty to exercise his sense of sight and hearing to avoid the danger of such trains; but where there is nothing in the surroundings from which danger from an approaching train could be anticipated, it is not contributory negligence for a workman crossing the tracks not to look or listen.'

"Thus it is to be seen that in the case of one lawfully upon the track whose presence is to be anticipated by the railroad company, he is not in all events to be adjudged guilty of contributory negligence upon the mere showing that he did not look for an approaching train before going upon the track, but instead the question of whether he may be said to have exercised due care for his own safety is to be considered in the light of the danger he had reason to apprehend, relying, as he would have had the right to do, upon the fact that the railroad company would not itself be negligent in the matter of taking proper precautions to avoid causing injury to him. This does not mean, of course, that his failure to look might not ever be held to have constituted contributory negligence, but only that whether it is to be so regarded must be determined by all the facts and circumstances of the particular case.

"In the case at bar, not only was Willig entitled to rely upon the fact that the railroad company, knowing of the nature of the work being done in connection with the construction of the overpass, would see to it that proper precautions would be taken for his protection, but in addition, so far as he had been led to believe, there was no danger for him to anticipate at the hour of the morning when his injury was received. Our Supreme Court has well said that 'negligence is not imputable to a person for failing to look out for a danger, when, under the surrounding circumstances, the person sought to be charged with it had no reason to suspect that danger was to be apprehended.' [Langan v. St. Louis, I. M. & S. Ry. Co., 72 Mo. 392, 398.] In this instance Willig knew that no train was regularly scheduled during the forenoon, and, so far as special trains were concerned, it was at best for the jury to say whether he had the right to rely upon the information which the section foreman 'always' gave regarding the time of their arrival. We need only point

out that this feature of the case involves no question of whether, in following the practice of conveying such information to the men at work on the overpass, the section foreman was acting within the scope of his authority as an agent of the railroad company, but only the question of whether, in relying upon that information, Willig was acting as a reasonably prudent person would have acted under the same or similar circumstances. [Lincoln v. St. Louis-S. F. Ry. Co., 223 Mo. App. 46, 49, 7 S. W. (2d) 460, 461.]

"We appreciate that regardless of the above considerations which reflect the most favorable view of the case from plaintiff's standpoint, some persons might nevertheless conclude that Willig, in the exercise of due care for his own safety, should have glanced down the track before allowing himself to get upon it. The question for us, however, is not whether certain persons might conceivably be expected to reach the conclusion that no reasonably prudent person would have done as Willig did under the circumstances, but whether all reasonable minds would be compelled to reach that same conclusion, for it would be only in the latter contingency that the issue could be ruled as one of law. [Cento v. Security Building Co. (Mo.), 99 S. W. (2d) 1.] 'The court is authorized to pronounce certain conduct negligent only when no other construction may fairly and reasonably be placed upon it in the circumstances; but where the facts are such as would warrant a reasonable inference that ordinary care has been taken by the person in question, the issue, whether or not such care was really exercised by him, is for triers of the fact to decide.' [Dixon v. Chicago & A. Ry. Co., 109 Mo. 413, 427, 19 S. W. 412.]

"In this case the evidence left room for reasonable difference of opinion upon the question of whether Willig's conduct measured up to that to be expected of a reasonably prudent person in his situation, which means that the issue of his contributory negligence was one for the jury to determine. It follows, therefore, that the respective demurrers to the evidence were properly overruled. [Johnson v. Waverly Brick & Coal Co., 276 Mo. 42, 205 S. W. 615; McQuitty v. Kansas City S. Ry. Co., 196 Mo. App. 450, 194 S. W. 888; Hudgens v. St. Louis & S. F. Ry. Co., 139 Mo. App. 44, 119 S W. 522; Lincoln v. St. Louis-S. F. Ry. Co., supra.]

"The point is also made that error was committed in the giving of plaintiff's Instruction No 5.

"By this instruction the jury were told that even though Willig did not look out for the approaching train before entering upon the track, yet if the jury found and believed from the evidence that he acted as a reasonably prudent person would have acted in the exercise of ordinary care for his own safety under the surroundings and circumstances of which he was shown to have had knowledge, then he was not guilty of contributory negligence in failing to look out for the train before entering upon the track.

"Suffice it to say that the law as declared by this instruction was merely that which we have followed in determining that the case was one for the jury as against the contention that Willig was guilty of contributory negligence as a matter of law.

"Other points assigned as error were either not preserved in the motion for a new trial, or else have been abandoned in the further course of the brief and argument."

We add a few observations relative to the Tanner case, in view of the fact that one of the learned judges of the Court of Appeals deemed the majority opinion of that court in conflict with our opinion in said Tanner case. In the Tanner case the plaintiff was struck by an east bound train on the defendant's railroad in front of its depot at Sedalia, Missouri. That train, No. 10, was due to arrive at 1:50 A. M. on the defendant's track number two. Another train, No. 9, west bound, was due to arrive at 1:43 A. M. on the adjacent track number one. The bulletin board showed both trains on time. In fact No. 9 came in about five minutes late and No. 10, the one which struck the plaintiff, on time. The plaintiff himself did not see the bulletin board. He knew the scheduled time of the trains and knew that No. 9 had just arrived and *having heard* that the bulletin board said both trains were on time he supposed No. 10 would not be in for seven minutes. Having business at the depot he was there and was standing on track number two, giving no heed to the approach of train No. 10, when it came in—on time as we have said—and struck him. He was held guilty of contributory negligence, barring recovery.

We think there is a marked difference in the facts between the Tanner case and the instant case. In the Tanner case the train which struck the plaintiff was a scheduled train, as the plaintiff knew, and was on time. The plaintiff *assumed,* because a train due to arrive seven minutes earlier had just come in, that said earlier train was on time and that therefore the train which struck him would not be in for seven minutes. He seems to have relied solely on what he had heard as to the bulletin board showing both trains on time and his assumption that because train No. 9 had just come in therefore train No. 10 would not be in for seven minutes. In the case before us we have a quite different situation. No trains were scheduled to run during the forenoon. Special trains ran but seldom. When a special was to come through it was the custom and practice of the railroad company to notify the workmen employed about the overpass of the fact and the time when such special train would come along. The evidence most favorable to plaintiff—which, in ruling a demurrer, must be taken as true—is to the effect that such notice was always given. It is argued that the notice given to Willig's superintendent and by him transmitted to Willig and the other workmen that two special trains would pass "about noon" was not an assurance or an intimation that there would not be other special trains or a special

train at an earlier hour. We cannot yield assent to that argument. In view of all the circumstances and of the custom to notify the workmen when a special train was to come through the information that two special trains would come through "about noon" would naturally be understood—at least might reasonably be understood—to imply that only those two special trains need be anticipated.

It follows for the reasons stated that the judgment of the circuit court should be affirmed. It is so ordered. *Westhues, C.,* absent; *Bohling, C.,* concurs.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.

### ON MOTION FOR REHEARING.

PER CURIAM:—Appellants in their motion for rehearing say that we appear to have considered the case as though it were here on certiorari because we adopted the majority opinion of the Court of Appeals and said it was not in conflict with the opinion of this court in Tanner v. Mo. Pacific Railroad Co., 161 Mo. 497, 61 S. W. 826. We did not consider or treat the case as a certiorari proceeding but, as stated in our opinion, adopted the opinion of the Court of Appeals as our own because after due consideration we concluded it correctly disposed of the questions presented on the appeal. In so doing we were not without precedent. The same course was followed in Cooley v. Kansas City, P. & G. Railroad Co., 149 Mo. 487, 51 S. W. 101, which was certified to this court by the Kansas City Court of Appeals because of conflict between its decision and a prior decision of the St. Louis Court of Appeals and was here for disposition on the merits.

It is urged that we did not take into consideration certain cases cited by appellants in their brief filed here which were not cited in their brief in the Court of Appeals and, therefore, not considered by that court, viz.: Giardina v. St. L. & M. R. Railroad Co., 185 Mo. 330, 84 S. W. 928; Farris v. St. L. & S. F. Railroad Co., 167 Mo. App. 392, 151 S. W. 979; Boyd v. Wabash Western Railroad Co., 105 Mo. 371, 16 S. W. 909, and some cases from other jurisdictions. We examined those cases but we think they are distinguishable in their facts from the instant case and at least no more in point than the Tanner case, if as much so. We discussed and distinguished the Tanner case in the original opinion.

Appellants say the record does not warrant the statement in our opinion that when a special train was to come through it was the custom and practice of the railroad company to notify the workmen employed about the overpass of the fact and the time when such special train would come along. One of those workmen, a witness for plaintiff,

718

testified that defendants' section foreman "always came by on his motor car and told us when any special trains would be through." In a deposition given by defendant Fritts he was asked what information was given to railroad employees when an unscheduled train was to be run. He said, "The section foreman before going to work in the morning gets in touch with the dispatcher (train dispatcher) through the operator on the 'phone and is given what we term a line up as to train movements for that day." He said that was the usual and customary. practice; that the information was thus given so that the employees would know what train movements were to be made during the day. Fritts' deposition was introduced by plaintiff and was admitted only as against him, the jury being instructed not to consider it as against the railroad company. Perhaps for the sake of accuracy, we should have said in our opinion that it was the custom and practice of the railroad company's *section foreman* to notify the workmen employed about the overpass when a special would come along and to that extent the opinion may be considered modified. However, said foreman must have obtained his information from officials of the railroad company having charge of train movements. How else could he have gotten it? And in any event the fact that he did give such information to the workmen, or to their foreman by whom it was transmitted, as intended, to the workmen, was a fact to be considered in determining deceased's alleged contributory negligence. It would not be unnatural for deceased to have regarded the information so received as authoritative.

The motion for rehearing is overruled.