Jerry DROWN, Plaintiff-Respondent,

v.

MISSOURI–KANSAS–TEXAS RAILROAD
COMPANY, a Corporation, De-
fendant-Appellant.

No. 32538.

St. Louis Court of Appeals.

Missouri.

March 21, 1967.

Motion for Rehearing or to Transfer to Su-
preme Court Denied April 25, 1967.

Application to Transfer Denied June 12, 1967.

Fordyce, Mayne, Hartman, Renard &
Stribling, Alphonso H. Voorhees, St. Louis,
for defendant-appellant.

Gray & Sommers, St. Louis, for plaintiff-
respondent.

DOERNER, Commissioner.

Plaintiff, a switchman employed by the Wabash Railroad Company, was struck by an engine owned and operated by the Missouri-Kansas-Texas Railroad Company, (referred to as the Katy by the witnesses) and brought this action for personal injuries against both carriers. Trial to a jury resulted in a verdict against the plaintiff and in favor of the Wabash, and in favor of plaintiff and against the Katy for $12,500. From the ensuing judgment the Katy appealed.

No question is raised by the Katy regarding its negligence. What it asserts, as its initial point, is that the plaintiff was guilty of contributory negligence as a matter of law. The burden to prove such negligence on the part of plaintiff was, of course, on the defendant, and the rule is that the " * * * proof of plaintiff's negligence must appear from evidence adduced by him or from evidence which he concedes to be true or from binding documentary evidence, or by proof of facts and circumstances by defendant which leave room for no other reasonable inference, or from a combination of them, in order that a court correctly may declare plaintiff contributorily negligent as a matter of law. * * *" Pipes v. Missouri Pac. R. Co., Mo., 338 S.W.2d 30, 33. Reviewing the record in accordance with that rule, the plaintiff's evidence was that in the area of Moberly, Missouri, where the accident occurred, there were three sets of tracks involved in the casualty. All three paralleled each other and ran in a north-south direction. Westernmost was the Wabash main line, east of it the Katy transfer track, and to the east of it the Katy main line. A public street, named Whitman, crossed all three tracks at a right angle. There was a connection between the Wabash main line and the Katy transfer track, called the crossover track. It began at a switch on the Wabash main line located an unstated distance south of Whitman Street and ran in a southeastwardly direction for about 300 feet, according to the plaintiff, to a switch on the Katy transfer track. Plaintiff placed the transfer switch, which was the scene of the accident, as approximately 280 or 320 feet south of Whitman Street.

A number of cars were spotted on the transfer track south of Whitman Street. Plaintiff did not testify as to the number of cars and stated that he could not give any idea as to the distance between the south end of such cars and the transfer switch. W. C. Durbin, plaintiff's foreman, whose deposition was read in evidence by plaintiff, gave no estimate of the distance in feet, but said that the south end of the cars was approximately straight east of the switch stand on the Wabash main line. Henry A. Oswald, the fireman on the Katy engine which struck plaintiff, whose deposition was also read in evidence by plaintiff, testified that there were six cars spotted on the transfer track south of Whitman, and estimated the distance between the south end of such cars and the switch on the transfer track as 250 feet.

At about 9:00 A.M. on December 12, 1962, the Wabash engine on which plaintiff was working as a pinpuller began an operation by which it was intended that two cars of coal would be transferred from the Wabash to the Katy and be coupled on to the south end of the cars spotted on the Katy's transfer track. The weather was clear but cold, the temperature being 10° below zero, and there was some snow on the ground which had fallen during the preceding night. Plaintiff was wearing a hat, and a parka with a hood that covered the top of his head and his ears but left his forehead and face exposed. The operation began in the yards north of Whitman Street, with the Wabash engine backing southwardly on the Wabash main line, pulling the coal cars. As it passed Whitman Street plaintiff, riding on the southeast corner of the engine, looked to the east and saw the Katy engine standing still on a Katy auxiliary track east of the Katy main line. Its crew, he testified, were not on the engine but were standing in the

area between Whitman Street and the sidewalk. As plaintiff's engine neared the switch on the Wabash main line plaintiff signaled his engineer to stop and stepped off, lined the switch so that the engine could enter the crossover track, and then signaled the engineer to start up. When it moved up to him he stepped up onto the ladder at the southeast corner of the engine, which proceeded onto the crossover, moving in a southeastwardly direction.

Plaintiff testified that when his engine had proceeded slightly more than halfway through the 300 feet crossover track he turned to his left and looked to the north. He stated at one point that he saw the Katy transfer track and "a small portion" of the Katy main line, but that he couldn't see all of the Katy main line up to Whitman Street because the cars on the transfer track blocked his vision. At another point, he testified that "When I saw the main line track, I could see all the way up. I seen cars on the Katy transfer, and I could not see Whitman Street." Plaintiff testified that thereafter he "probably" looked out of the corner of his eye but conceded that " * * * I never turned directly around to look again that I can remember."

The switch stand which controlled the switch where the crossover connected with the transfer track was located on the west side of the track. The switch was already lined so that the Wabash engine and the coal cars could proceed onto the transfer track without stopping. The movement intended was that they would drag past the transfer switch, which plaintiff would then throw, so that the cars could be pushed northwardly on the transfer track and coupled onto the cars spotted thereon. Plaintiff testified that as the engine, proceeding about 5 to 7 miles per hour, approached the transfer switch he gave the engineer an easy sign, to slow the movement of the train down, and stepped off with his left foot. He stated on direct examination that he "took several steps; two or three, something like that," in a southeastwardly direction, to get clear of the engine, and that as he was turning around to his right he "seen a movement out of my right eye. I turned my head and the train hit me." On cross-examination he stated that as he stepped off the engine and took the steps on the ground he was facing in a southeastwardly direction. Asked whether his steps took him over between the two rails of the Katy main line he answered: "I think that I stepped over them, sir. I am not certain but I think that I did." He admitted that when he got turned around the Katy engine was "just right on top" of him, that he raised up his hands to try to push away, and that somehow he got himself out from between the two rails of the Katy main line so that he was between the Katy main line and the transfer track when he was struck.

Oswald, the Katy fireman whose deposition plaintiff read, testified that as the Katy engine was backing southwardly on the Katy main line he saw the Wabash train moving southeastwardly on the crossover, then at a point about 80 feet from the transfer switch; that he did not see plaintiff riding on the Wabash engine, and that he first saw him when plaintiff stepped off at the transfer switch. At that moment, according to Oswald, the Katy engine was only 40 feet from plaintiff, and was traveling at 10 miles per hour. He stated that plaintiff stepped southeastwardly and that he called to his engineer to "big hole" it. Durbin, the plaintiff's foreman, testified in his deposition that he got off the Wabash engine with plaintiff at the switch on the Wabash main line; but that instead of getting back on as the engine moved through the crossover he walked straight east to the south end of the cars spotted on the transfer track. He testified that he didn't observe the Katy engine until it went past him as he was opening the knuckle on the end of the cars on the transfer track to make the coupling easier. At that time, according to Durbin, the Wabash engine was close to ("right at") the transfer switch but plaintiff had not yet dropped off of the

Wabash engine. The Katy engine, he said, was going 20 to 25 miles an hour. His description of what he then observed was: " '* * * Well, I just observed that about the time the (Katy) engine went by me Jerry had stepped off and he had turned around and put his hands like that and that is all I could see; when I saw his hands go up, I turned my head.' " He turned his head, he stated, because he didn't want to see plaintiff get hit.

No plat of the area was referred to or introduced, and there is a paucity of information regarding various distances. For example, no estimate was given by any witness of the distance between the Katy main line and the transfer track, or, for that matter, between the transfer track and the Wabash main line. The only reference to the former was in Oswald's deposition, in which when asked the distance between the side of an engine on the Katy main line as it went by cars on the transfer track, he answered, " 'I am going to make a guess of two and a half foot.' " No testimony was given as to any overhang of an engine or of freight cars, although the photographs introduced into evidence indicate that both have some. While a photograph of the scene of the accident is in evidence, showing plaintiff standing between the west rail of the Katy main line and the east rail of the transfer track, it is obvious that the camera was some distance away, and because of the distortion which occurs when a picture is taken of railroad tracks running towards the horizon, it is difficult to determine with any degree of accuracy the distance between such rails. Taking judicial notice that the standard gauge of railroad track is 4 feet 8½ inches, West v. St. Louis-San Francisco Ry. Co., Mo., 295 S.W.2d 48, and using that as a basis of comparison, the photograph appears to indicate that the distance was from 6 to 8 feet.

Defendant bases its argument that plaintiff was contributorily negligent as a matter of law upon the admitted fact that plaintiff did not look to the north before stepping off of his engine and upon its main line, when if he had looked he could have seen its engine approaching in plain view, not more than 40 feet away.

A railroad track is itself a signal or warning of danger. Hence it is a general proposition of railroad law—particularly so in crossing cases—that before one goes upon a track he must look and listen for approaching trains, and that if he fails to look and listen when to have done so would have enabled him to have seen or heard the train in time to have avoided being injured by it, then he is to be adjudged guilty of contributory negligence as a matter of law. Pipes v. Missouri Pac. R. Co., Mo., 338 S.W.2d 30; Willig v. Chicago, B. & Q. R. Co., 345 Mo. 705, 137 S.W.2d 430; Schmidt v. Missouri Pac. R. Co., 191 Mo. 215, 90 S.W. 136, 3 L.R.A.,N.S., 196. From an early date in our judicial history a similar doctrine was applied to section hands, switchmen and other employees working on tracks or in and about railroad yards or cars, for it was held that when going on or near tracks they were under the duty to look out for themselves, in the absence of any rule, custom or assurance requiring that a warning be given them. Goodwin v. Missouri Pac. R. Co., 335 Mo. 398, 72 S.W.2d 988; Van Dyke v. Missouri Pac. R. Co., 230 Mo. 259, 130 S.W. 1; Loring v. Kansas City, Ft. S. & M. R. Co., 128 Mo. 349, 31 S.W. 6. That doctrine was modified to some extent, however, in Willig v. Chicago, B. & Q. R. Co., 345 Mo. 705, 137 S.W.2d 430, in which the Supreme Court quoted and adopted the opinion of this court. Willig v. Chicago, B. & Q. R. Co., Mo.App., 121 S.W.2d 204. In that case Willig, an employee of a construction company engaged in building an overpass at a place where a highway crossed the railroad, was fatally injured when he stepped upon a railroad track without looking. The undisputed evidence was that the train which struck him was then in plain view, 400 feet away, and traveling at about 40 miles an hour. But it was shown that during the entire period of construction of the overpass no trains were regularly scheduled to

run during the forenoon, (the accident occurred at 9:00 A.M.), and that the only scheduled trains passed in the afternoon. Of even greater importance, it was also shown that when any special trains were scheduled to pass the point the defendant's section foreman always notified the construction company's superintendent, and that on the very day in question, at about 7:00 A.M., the section foreman informed the construction company's superintendent that there would be a couple of special trains through around noon, which information the superintendent passed on to his men, including Willig, sometime between 7:30 and 8:00 A.M. Citing only a passage from 52 C.J. 680 as its authority, and emphasizing the undisputed fact that Willig had been informed that no special train would pass, upon which he was entitled to rely, the court stated that a railroad employee was not in all events to be adjudged guilty of contributory negligence for failing to look, but that, " * * * whether it is to be so regarded must be determined by all the facts and circumstances of the particular case." (137 S.W.2d 436). And it held that under the facts there prevailing the issue of Willig's contributory negligence was one upon which the minds of reasonable men might differ, and therefore a question for the jury. In this respect the Willig case appears to accord with certain intimations in the earlier case of McQuitty v. Kansas City Southern R. Co., 196 Mo.App. 450, 194 S.W. 888.

It is apparent that the salient facts which determined the result in the Willig case was his knowledge that no regular trains were scheduled to run at the time he stepped upon the track without looking, and the railroad company's positive assurance that no special train would pass until a much later hour. It was this factor of Willig's knowledge which the Supreme Court stated distinguished that case from Tanner v. Missouri Pac. R. Co., 161 Mo. 497, 61 S.W. 826. There the westbound train which struck Tanner, No. 10, was a scheduled train, as the plaintiff knew, and was on time. Tan-

ner had heard that an eastbound train, No. 9, which ordinarily arrived at the depot 7 minutes before No. 10, was running on time. When it arrived he assumed it was on time and stood on No. 10's track watching passengers disembark from No. 9, with his back to the east and without looking or listening for No. 10. The fact was that No. 9 was late, and No. 10 arrived shortly and struck plaintiff. The Supreme Court held that in the light of Tanner's knowledge that No. 10 was due to arrive on the track on which he was standing, he was guilty of contributory negligence as a matter of law in failing to look or listen.

The determining factor in both the Willig and the Tanner cases was that of knowledge of the respective plaintiffs regarding the traffic which would or would not occur on the tracks upon which they stepped or stood without looking or listening. That feature of the case was not developed in Atlantic Coast Line R. Co. v. Driggers, 279 U.S. 787, 49 S.Ct. 490, 73 L.Ed. 957, in which the facts are strikingly similar to those in the instant case. There the parallel main line tracks involved, running north and south, had a clearance of 7 feet 8½ inches from rail to rail. Driggers, a member of a switching crew, was working on an engine engaged in transferring some cars to another railroad. For that purpose his engine moved northwardly on the easterly set of tracks, and after a switch was thrown, onto a spur which ran in a northeastwardly direction. After cutting out a car it returned back down the spur, towards the switch, with the engine facing south or southwesterly. Driggers was standing on the right hand footboard, facing nearly south. Just as his engine reached the switch, without looking to the north, he stepped off into the space between the two main lines and swung or was thrown against the pilot sill of a train traveling southwardly on the westernmost track. As plaintiff points out, the case was controlled by the Federal Employers Liability Act, and recovery was denied because the court held that no negligence on the part of the defendant was shown. But

the court also held, of particular significance to us, that Driggers was negligent in failing to look to the north before he stepped off his engine, and that his own negligence was the sole cause of the accident which resulted in his death (279 U.S. 792, 49 S.Ct. 49):

"Under these circumstances, it is clear that Driggers, by his own negligence, as the sole and direct cause of the accident, brought on his own death, and that there is no ground upon which the liability of the Railroad Company may be predicated."

■ There is a marked difference between the facts in the Willig case and those in the present case. In Willig the plaintiff knew that no regular train was scheduled to pass the place when he stepped upon the track, and had received definite assurance from the defendant that no special train would operate thereon until much later in the day. While the extent of the present plaintiff's knowledge of traffic on the track was not shown, he certainly had not been assured that none would occur. As he passed Whitman Street he had seen the Katy engine which subsequently struck him, and while it was then stopped on an auxiliary track, he did not know what it was going to do in the next five seconds or five minutes, as he admitted on cross-examination. Furthermore, the track upon which he stepped without looking was the Katy's main line, and within the confines of the railroad yards where more traffic would be likely to occur, as plaintiff was bound to know, for during the three months he had been employed by the Wabash he had engaged in switching operations in that vicinity on prior occasions. It is clear from plaintiff's own testimony and that of his witnesses that plaintiff stepped upon the Katy main line without looking to the north at a time when the Katy's engine was within approximately 40 feet of him, and that if he had looked to the north before stepping off of his engine he could have seen the approaching engine, refrained from stepping off or at least not stepped upon the Katy's track, and thereby have avoided his injury. Under those circumstances we are of the opinion that plaintiff must be adjudged guilty of contributory negligence as a matter of law. Atlantic Coast Line R. Co. v. Driggers, supra; Van Dyke v. Missouri Pac. R. Co., supra; Loring v. Kansas City, Ft. S. & M. R. Co., supra.

For that reason the judgment in favor of plaintiff and against the defendant Missouri-Kansas-Texas Railroad Company is reversed.

PER CURIAM:

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court. Accordingly, judgment is reversed.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.